# EXHIBIT H

```
                                        Page 1
 1           SUPREME COURT OF THE STATE OF NEW YORK
 2                    COUNTY OF JEFFERSON
 3     _____
 4     RICHARD CONVERSE, STEPHANIE
 5     CONVERSE,
 6               Plaintiffs,
 7          v.                              Case No.
 8     STATE FARM FIRE AND CASUALTY         5:21cv457
 9     COMPANY,
10               Defendants.
11     _____
12               VIDEOCONFERENCE DEPOSITION OF
13                    STEPHANIE CONVERSE
14     DATE:           Tuesday, July 26, 2022
15     TIME:           10:02 a.m.
16     LOCATION:       Remote Proceeding
17                     17557 Brickstone Loop
18                     Fort Myers, FL 33967
19     REPORTED BY:    Jennifer Estevez, Notary Public
20     JOB NO.:        5341772
21
22
23
24
25
```

1            A P P E A R A N C E S

2   ON BEHALF OF PLAINTIFFS RICHARD CONVERSE, STEPHANIE

3   CONVERSE:

4        RYAN MCCARTHY, ESQUIRE (by videoconference)

5        Westfall Law PLLC - NY

6        247 West Fayette Street, Suite 203

7        Syracuse, NY 13202

8        rmccarthy@westfalllaw.com

9

10  ON BEHALF OF DEFENDANTS STATE FARM FIRE AND CASUALTY

11  COMPANY:

12       MICHAEL WELCH, ESQUIRE (by videoconference)

13       Rivkin Radler LLP

14       926 RXR Plaza West Tower, 9th Floor

15       Uniondale, NY 11556-3823

16       michael.welch@rivkin.com

17       516-357-3443

18

19

20

21

22

23

24

25

Page 3

1                      I N D E X

2    EXAMINATION:                              PAGE

3         By Mr. Welch                         7

4

5                   E X H I B I T S

6    NO.                DESCRIPTION            PAGE

7    Exhibit SC0001   Demolition and Cleanup

8                     Proposal                 96

9    Exhibit SC0002   BT Construction Estimate 97

10   Exhibit SC0003   Judge Renzi E-mail       99

11   Exhibit SC0004   Text Messages            104

12   Exhibit SC0005   Income Tax Return 2020   105

13                    (Exhibits attached.)

14

15     P R E V I O U S L Y   M A R K E D   E X H I B I T S

16   NO.                DESCRIPTION            PAGE

17   Exhibit RC0001   Complaint                45

18   Exhibit RC0002   Deed 2/21/21             62

19   Exhibit RC0003   Pelton Letter            73

20   Exhibit RC0004   Fire Investigation

21                    Report 10/30/20          66

22   Exhibit RC0005   Listing Agreement 6/5/19 88

23                    (Exhibits attached.)

24

25

```
 1        I N F O R M A T I O N   R E Q U E S T E D
 2     NO.        DESCRIPTION                      PAGE
 3     1          Estimates and correspondence with
 4                contractors regarding repair of
 5                442 Flower Avenue East            31
 6     2          Lease agreements between tenants
 7                at 442 Flower Avenue East         33
 8     3          Itemized list of personal property
 9                contents claims with valuations   61
10     4          All communications regarding
11                flight confirmation to New York
12                in February 2020                  77
13     5          Joe Pelton's cell phone number
14                currently and in 2019             86
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              S. CONVERSE

 2         THE REPORTER:  Good morning.  My name

 3    is Jennifer Estevez; I am the reporter

 4    assigned by Veritext to take the record of

 5    this proceeding.  We are now on the record

 6    at 10:02 a.m.

 7         This is the deposition of Stephanie

 8    Converse taken in the matter of Richard

 9    Converse and Stephanie Converse vs. State

10    Farm Fire & Casualty Company on July 26,

11    2022, at 17557 Brickstone Loop, Fort

12    Myers, Florida 33967.

13         I am a notary authorized to take

14    acknowledgments and administer oaths in

15    New York.  Parties agree that I will swear

16    in the witness remotely.

17         Additionally, absent an objection on

18    the record before the witness is sworn,

19    all parties and the witness understand and

20    agree that any certified transcript

21    produced from the recording of this

22    proceeding:

23         - is intended for all uses permitted

24    under applicable procedural and

25    evidentiary rules and laws in the same
```

```
 1                    S. CONVERSE
 2      manner as a deposition recorded by
 3      stenographic means; and
 4          - shall constitute written
 5      stipulation of such.
 6          At this time will everyone in
 7      attendance please identify yourself for
 8      the record, starting with Defendant's
 9      counsel.
10          MR. WELCH:  Counsel for State Farm
11      Firm & Casualty Company is Michael Welch,
12      and I agree to that stipulation.
13          MR. MCCARTHY:  Attorney for Plaintiff
14      Stephanie Converse, the deponent, Ryan
15      McCarthy, and we also agree to that
16      stipulation.
17          MS. CONVERSE:  Stephanie Converse,
18      and I also agree to that statement.
19          THE REPORTER:  Okay.  Thank you.
20      Hearing no objection, I will now swear in
21      the witness.
22          Please raise your right hand.
23  //
24  //
25  //
```

Page 7

1                     S. CONVERSE

2    WHEREUPON,

3                  STEPHANIE CONVERSE,

4    called as a witness, and having been first

5    duly sworn to tell the truth, the whole

6    truth and nothing but the truth, was

7    examined and testified as follows:

8              THE REPORTER:  Okay.  You may begin.

9              MR. WELCH:  Okay.  Thank you.  Okay.

10             Good morning, Ryan.

11                     EXAMINATION

12   BY MR. WELCH:

13       Q    Good morning, Ms. Converse.

14       A    Good morning.

15       Q    My name is Michael Welch, and

16   I'm an attorney of Rivkin Radler.  I

17   represent State Farm Fire & Casualty

18   Company in connection with the litigation

19   that you have brought, together with

20   Richard Converse, against State Farm.  I'm

21   going to be asking you a series of

22   questions today.  If you do not understand

23   my question, please let me know that.

24   I'll be happy to rephrase.  Okay?

25       A    Yes.

                              S. CONVERSE

1

2       Q     Okay.  If you answer the

3   question that I pose to you, the

4   assumption is going to be that you

5   understood it.  So it's very important

6   that you do understand the question I'm

7   asking and ask me to rephrase if needed.

8   Okay?

9       A     Yes.

10      Q     All right.  Also, we're going to

11  need a verbal response to my questions.

12  So no head nods, shoulder shrugs, that

13  kind of thing.  Okay?

14      A     Yes.

15      Q     All right.  And also, it's very

16  important, especially in this format where

17  everybody is remote, that oftentimes

18  you're going to know what my question is

19  to you before I finish it.  I just ask

20  that you give me the courtesy of first

21  asking my question in full.  And I will

22  give you the same courtesy of answering,

23  so we're not speaking over each other.

24  Okay?

25      A     Yes.

```
 1                    S. CONVERSE
 2        Q    Okay.  Also, Ms. Converse, I'm
 3   not interested today in having you guess
 4   or speculate with respect to the answer to
 5   a question.  If you do not know the answer
 6   to a question, you can simply state that
 7   you do not know.  Okay?
 8        A    Yes.
 9        Q    All right.  Also, if you need to
10   take a break at any time, that's perfectly
11   acceptable.  The only condition being is
12   if I've asked you a question, I need you
13   to first answer the question on the
14   record, and then we can take a break.
15   Okay?
16        A    Yes.
17        Q    All right.  Ms. Converse, have
18   you taken any medication today that would
19   affect your testimony or ability to
20   testify in this case?
21        A    No.
22        Q    Okay.  And the address that you
23   gave on the record, the 1755 Brookstone
24   Loop, was that the address?  Did I note
25   that correctly?
```

```
                                          Page 10
 1                    S. CONVERSE
 2       A     No.
 3       Q     Okay.  What's the --
 4       A     It's --
 5       Q     Go ahead.
 6       A     17557 Brickstone Loop.
 7       Q     Brickstone.
 8       A     Correct.
 9       Q     Okay.  Thank you.  And that's at
10   Fort Myers?
11       A     Yes.
12       Q     All right.  Is that a apartment
13   or private house or something else?
14       A     Townhouse.
15       Q     Do you reside there with anyone?
16       A     Yes.
17       Q     Who do you live with?
18       A     Michael Rogers and my son,
19   Keegan Rogers.
20       Q     Okay.  And prior to -- well, how
21   long have you lived at the Brickstone Loop
22   address?
23       A     Since February 2020.
24       Q     Okay.  And prior to that time,
25   you lived at the 3910 Preserve Way
```

```
                                      Page 11
 1                      S. CONVERSE
 2    address?
 3         A    Yes.
 4         Q    Okay.  And what type of property
 5    was that?
 6         A    Single family home.
 7         Q    Now, Ms. Converse, in connection
 8    with your appearance today for your
 9    deposition, did you review any documents?
10         A    Yes.
11         Q    What did you review?
12         A    My EUO, the listings of my
13    house, and an itemized of what we are
14    looking to get from State Farm.
15         Q    Okay.  So when you say, "EUO,"
16    that would be the EUO transcript; correct?
17         A    Yes.
18         Q    Okay.  And did you read it in
19    its entirety?
20         A    No.
21         Q    When did you read the transcript
22    prior to today?
23         A    When I received it from Mura.
24         Q    Okay.  That would be from a Roy
25    Mura?
```

Page 12

S. CONVERSE

1
2      A    Yes.
3      Q    Okay.  So that would have been
4  over a year ago at least?
5      A    Yes.
6      Q    Okay.  Have you read it more
7  recently in preparation for today?
8      A    Yes.
9      Q    Okay.  When was the last time
10  you read the transcript?
11     A    Last night.
12     Q    Okay.  And when you say you
13  reviewed the listings for the house, what
14  are you referring to?
15     A    When the house was up for sale.
16     Q    Okay.  And the house we're
17  referring to, is that 442 Flower Avenue
18  East, Watertown, New York?
19     A    Yes.
20     Q    Okay.  And the itemized list or
21  the -- withdrawn.  You had testified that
22  there was also, like, some itemized list
23  of things you were looking to get from
24  State Farm.  What was that?
25     A    That should -- that was

Page 13

S. CONVERSE

1
2    submitted to you between my attorney and
3    yourself.
4          Q     Okay.  So it was, like, an Excel
5    spreadsheet or something similar?
6          A     Yes.
7          Q     Okay.  Okay.  Aside from the EUO
8    transcript, the listings of the house, and
9    that itemization of damages, was there
10   anything else you reviewed in preparation
11   for your deposition?
12         A     Your questions.  Let me see.
13   What's it called?  It was some of the
14   questions that you were going to ask about
15   the phone call between Julio and myself,
16   as well as the sheriff's questions.
17         Q     Okay.  Did you review a document
18   that was provided by State Farm as a
19   response to interrogatories?  Would that
20   be what you're referring to?
21         A     Yes.
22         Q     Okay.  Aside from that document,
23   Ms. Converse, did you review anything
24   else?
25         A     No.

```
 1                   S. CONVERSE
 2       Q     Did you meet with your attorney?
 3       A     Yes.
 4       Q     Okay.  How long did you meet
 5   for?
 6             MR. MCCARTHY:  Objection.
 7             MR. WELCH:  I'm not asking --
 8             MR. MCCARTHY:  Yeah, it's privileged.
 9             MR. WELCH:  Not how long you met for.
10       What you discussed is privileged, not the
11       length of time you met.
12             MR. MCCARTHY:  What's the difference?
13             MR. WELCH:  I just want to know, how
14       long did you meet for?
15             MR. MCCARTHY:  I don't think you're
16       entitled to know.
17             MR. WELCH:  And what would be the
18       basis for that?
19             MR. MCCARTHY:  Privilege.  It's a ...
20   BY MR. WELCH:
21       Q     When did you meet with Counsel
22   in preparation for your deposition?
23             MR. MCCARTHY:  You can answer.
24       A     Two weeks ago and this morning.
25       Q      In preparation for your
```

```
                                    Page 15
 1                  S. CONVERSE
 2   deposition, Ms. Converse -- well,
 3   withdrawn.  Are you aware whether or not
 4   Richard Converse was deposed in this
 5   matter?
 6        A    I don't understand the question.
 7        Q    Sure.  Do you know that Richard
 8   Converse was deposed in this case?  He sat
 9   for a deposition like you're doing today?
10        A    Yes.
11        Q    Okay.  Did you speak with
12   Mr. Converse after his deposition?
13        A    Yes.
14        Q    Okay.  Did you discuss with
15   Mr. Converse what questions were asked of
16   him during his deposition?
17        A    Yes.
18        Q    What did he say?
19             MR. MCCARTHY:  I'll object to the
20        extent that there's attorney-client
21        privileged communication there.  I mean,
22        even though those are two Plaintiffs,
23        we're all apart of the same case.  And so
24        privileged communications that I told to
25        Richard that, you know, he said to
```

```
 1                    S. CONVERSE
 2        Stephanie is still privileged, because
 3        it's the common interest doctrine.
 4   BY MR. WELCH:
 5        Q    Did you, Ms. Converse, have
 6   separate conversations with Richard where
 7   your counsel was not present or a party to
 8   the conversation after Richard's
 9   deposition?
10             MR. MCCARTHY:  Same objection.  That
11        still calls for privileged information.
12        Even if I wasn't there, there's a common
13        interest doctrine.
14             MR. WELCH:  Ryan, the meeting is not
15        privileged.  I can ask about the meeting.
16        I'm not asking about anything that was
17        discussed that may have been discussed
18        with Counsel.  You got to just, like,
19        listen to the question I'm asking you.
20        It's about the meeting, not about the
21        conversation.
22             MR. MCCARTHY:  Okay.  Great.
23             Yeah, you can proceed and answer the
24        question if you can.
25             MR. WELCH:  All right.
```

Page 17

1                    S. CONVERSE

2   BY MR. WELCH:

3        Q    Do you need me to rephrase the

4   question, Ms. Converse?

5        A    Yes.

6        Q    Okay.  Did you, Ms. Converse,

7   have a conversation with Richard after he

8   was deposed, where your attorney,

9   Mr. McCarthy, was not present for that

10  conversation?

11       A    Yes.

12       Q    Okay.  Did Mr. Converse,

13  Richard, during that conversation with

14  you, discuss with you the questions that

15  were asked of him at his deposition?

16       A    Yes.

17       Q    Okay.  Have you reviewed

18  Mr. Converse's deposition transcript in

19  preparation for your deposition today?

20       A    No.

21       Q    Okay.  Ms. Converse, did you, in

22  preparation for your deposition today,

23  listen to any recorded conversations?

24       A    No.

25       Q    Okay.  Are you aware,

```
                                      Page 18
 1                  S. CONVERSE
 2    Ms. Converse, that there is a recording of
 3    a conversation that you provided to the
 4    Lea County Sheriff's Office back in
 5    January of 2020?
 6         A    Yes.
 7         Q    Okay.  Did you listen to that
 8    recording?
 9         A    No.
10         Q    Ms. Converse, how long did you
11    live at 3910 Preserve Way?
12         A    I don't know.
13         Q    Okay.  Was it longer than a
14    year?
15         A    Yes.
16         Q    Okay.  Would you have been
17    living at 39 Preserve Way on or about
18    December 8, 2019?
19         A    Yes.
20         Q    Okay.  And it's my understanding
21    that on December 8, 2019, there was a fire
22    at 442 Flower Avenue East, Watertown, New
23    York; is that correct?
24         A    Yes.
25         Q    Okay.  So if I used the phrase,
```

```
 1                    S. CONVERSE
 2    "date of fire" or "date of loss," we'll
 3    have an understanding that the date was
 4    December 8, 2019.  Okay?
 5         A    Yes.
 6         Q    Okay.  Ms. Converse, the
 7    property located at 442 Flower Avenue,
 8    when did you purchase that property?
 9         A    November of 2012.
10         Q    Okay.  And I know you gave a lot
11    of this testimony at the examination under
12    oath.  So I'm going to try not to repeat
13    my questions, but some of these are just,
14    you know, some foundation for what
15    follows.  Okay.  November of 2012, did you
16    purchase that property with anyone?
17         A    Yes.
18         Q    And who was that?
19         A    Richard Stephen Converse.
20         Q    Okay.  And at the time, was
21    there a mortgage taken out on the
22    property?
23         A    Yes.
24         Q    Okay.  Was Richard a co-borrower
25    on the mortgage?
```

```
                                              Page 20
 1                      S. CONVERSE
 2        A     No.  Well, we purchased it
 3    together.
 4        Q     Okay.  Was there -- do you know
 5    if he was on the application for the
 6    mortgage to finance the property, if you
 7    know?
 8        A     I don't know.
 9        Q     Okay.  Do you recall if
10    Mr. Converse -- well, withdrawn.  Did you
11    put down a down payment prior to
12    purchasing the property, if you recall?
13        A     Three and a half percent.
14        Q     Okay.  Do you recall if
15    Mr. Converse contributed any money toward
16    the down payment?
17        A     I can't recall.
18        Q     Okay.  Do you recall if
19    Mr. Converse contributed any money towards
20    any of the closing costs that may have
21    been incurred when you purchased the
22    property?
23             MR. MCCARTHY:  Form.  You can answer
24        if you understand.
25        A     I don't recall.
```

1                        S. CONVERSE

2        Q    What was the -- do you recall in

3    2012 why you purchased the property?

4        A    More as an investment, to live

5    in, and Richard's intentions were to move

6    back and work from Watertown.  So we

7    purchased it together to live in and an

8    investment.

9        Q    Okay.  Was there any -- did the

10   two of you have any contract or agreement

11   with respect to who would be responsible

12   financially for the property?

13       A    No.

14       Q    Did you have an understanding

15   with Richard when the property was

16   purchased who would be responsible for

17   paying the mortgage?

18            MR. MCCARTHY:  Form.  You can answer.

19       A    What was the question?

20       Q    Sure.  Who was responsible for

21   paying the mortgage when it was first

22   purchased in 2012?

23            MR. MCCARTHY:  Form.  You can answer.

24       A    We never -- I mean, I told them

25   that I would pay the mortgage, and he

```
                                        Page 22
 1                    S. CONVERSE
 2   would help if he had to.
 3        Q    Okay.  Did you pay the mortgage
 4   during the time, let's say, between
 5   November of 2012 and the date of the fire?
 6        A    Yes.
 7        Q    Okay.  Did Richard, if you
 8   recall, ever contribute financially toward
 9   the payment of the mortgage between that
10   time period?
11        A    Yes.
12        Q    And how much did he contribute
13   toward the payment of the mortgage?
14             MR. MCCARTHY:  Form.  You can answer.
15        A    $5,000 I believe.
16        Q    And when was that?
17        A    2019, around --
18        Q    When you look down,
19   Ms. Converse, are you reading from
20   something?
21        A    No, I'm looking at my cell
22   phone.
23        Q    Okay.  And you believe you
24   recall Richard giving you $5,000 in 2019?
25        A    Yes.
```

```
                                        Page 23
 1                   S. CONVERSE
 2        Q     Okay.  Do you recall what month
 3   he provided you with that money?
 4        A     I don't.
 5        Q     Okay.  And was that by check,
 6   cash, electronic transfer, something else?
 7        A     Electronic transfer.
 8        Q     Okay.  And did you owe $5,000
 9   towards the mortgage at that time?
10        A     No.
11        Q     Okay.  So was a portion of the
12   $5,000 to be used for the mortgage?
13        A     Yes.
14        Q     Okay.  How much?
15        A     The mortgage payment.
16        Q     Okay.  So whatever that amount
17   was -- let's say, $1,000, just
18   hypothetically.  If it was $1,000, that's
19   what would be used out of the 5,000 to pay
20   the mortgage?
21        A     I used some to pay the utilities
22   as well to keep the --
23        Q     Okay.  What about -- go ahead.
24        A     To keep the water and the
25   electricity on.
```

Page 24

1                          S. CONVERSE
2          Q     Okay.  What about the rest of
3     the money?
4          A     I used to help towards my rent
5     at Preserve Way.
6          Q     So between November of 2012 and
7     December 8th of 2019, Mr. Converse
8     contributed toward the payment of the
9     mortgage on one occasion sometime in 2019;
10    is that correct?
11         A     Yes.
12         Q     Okay.  And also the payment of
13    the utilities I guess; correct?
14         A     Yes.
15         Q     Did you -- was that a loan from
16    Mr. Converse to you?
17                MR. MCCARTHY:  Object to the form.
18         You can answer.
19         A     I don't remember.  I don't
20    believe I've borrowed money from Rich
21    before, and he knew I needed money to pay
22    the mortgage and utilities.  I have not
23    paid him back.
24         Q     Do you intend to pay him back?
25         A     When we sold the house, I

```
                          S. CONVERSE
 1
 2   planned on reimbursing Richard if he
 3   wanted it, but he told me he didn't want
 4   it.  So that would have -- be a
 5   conversation between us.
 6        Q    Okay.  When you borrowed the
 7   money in 2019, there was no agreement at
 8   that time with regard to the repayment of
 9   the $5,000; correct?
10        A    Correct.
11        Q    Okay.  Ms. Converse, it's my
12   understanding -- and please correct me if
13   I'm wrong -- that after the fire, the
14   mortgage was paid in full; correct?
15        A    Yes.
16        Q    Okay.  Have you received a
17   satisfaction of the mortgage from the
18   bank?
19        A    Yes.
20        Q    Ms. Converse, after -- well, at
21   some point, were you made aware that State
22   Farm had issued payments to the bank to
23   pay its interest in the property?
24        A    Can you repeat that?
25        Q    Sure.  At some point, State Farm
```

Page 26

1                        S. CONVERSE
2    made a payment to the bank; correct?
3         A     Yeah.
4         Q     Okay.  And there may have been
5    actually more than one payment, but after
6    the payments were issued, the mortgage was
7    satisfied; correct?
8         A     Correct.
9         Q     Okay.  Did you ever reach out to
10   the bank to request that, rather than
11   satisfy the mortgage, those funds be used
12   to repair the property?
13        A     No.
14        Q     And why is that?
15        A     I just wanted the mortgage paid
16   off.
17        Q     Okay.  Currently, Ms. Converse,
18   the property is still in a fire damaged
19   condition; is that correct?
20        A     Yes.
21        Q     Okay.  Since the date of the
22   fire of December 8, 2019, have you or
23   anyone on your behalf done anything to
24   repair any of the fire damage?
25        A     Please specify.

```
                                              Page 27
 1                    S. CONVERSE
 2        Q     Sure.  Well, have you retained
 3   anybody to do any work with the house to
 4   fix any of the fire damage?
 5        A     Not to fix the fire damage, but
 6   I hired somebody to go in and board up the
 7   house and make it to where we can try and
 8   save it.  And nobody goes in there, per
 9   State Farm's request.
10        Q     Okay.  Somebody went in there
11   and boarded up the house then; yes?
12        A     Yes.
13        Q     Okay.  And that was, I believe,
14   a relative of yours; is that correct?
15        A     Yes.
16        Q     Okay.  So since the property has
17   been boarded up though, there's been no
18   other work done to begin to repair some of
19   the fire damage; is that fair?
20        A     I'm not sure what they did
21   there.
22        Q     Okay.  Have you been inside the
23   house since December 8, 2019?
24        A     Yes.
25        Q     Okay.  Have you been to the
```

```
 1                  S. CONVERSE
 2   house since it's been boarded up?
 3       A    Yes.
 4       Q    Okay.  So what, if anything,
 5   have you observed about the condition of
 6   the property since the last time you were
 7   there, just in terms of its repair?
 8       A    Well, I mean, they didn't put
 9   new windows and new carpet.  I mean, they
10   made it stable to exactly what Julio had
11   requested to be done to have -- to secure
12   the place.  Was walls ripped out?  No.
13   Nothing was taken out.  Nothing was -- no
14   new windows or new flooring or anything.
15       Q    Okay.  That was my question.  It
16   wasn't a trick question.  It was just
17   what's been done to --
18       A    It was tricky.
19       Q    -- if anything, what's been done
20   to fix the place.  That's it.  If
21   nothing's been done, you can just say,
22   "Nothing's been done."  Have you retained
23   anyone -- a contractor, a general
24   contractor -- to begin to repair the
25   property?
```

```
                                    Page 29
                        S. CONVERSE
 1
 2        A     I don't understand your
 3   question.
 4        Q     Do you have any intention of
 5   fixing this property?
 6        A     Yes.
 7        Q     Okay.  Have you retained anybody
 8   to begin that process of repairing the
 9   home?
10        A     I did not retain anybody.  No
11   money down, but I got quotes.
12        Q     Okay.  The quotes would be for
13   the repair of the property, for the --
14   withdrawn.  The quotes are from
15   contractors to fix the place or something
16   else?
17        A     Contractors to fix it and
18   contractors to tear it down.
19        Q     Okay.  Do you have copies of the
20   estimates you received to fix the place?
21        A     I don't know.  I'd have to look.
22   That was a long time ago.
23        Q     Do you recall any of the names
24   of the persons who you received estimates
25   from?
```

```
                                         Page 30
 1                    S. CONVERSE
 2        A     I don't.
 3        Q     And you also obtained estimates
 4   to tear the place down; is that correct?
 5        A     Correct.
 6        Q     Okay.  Did you, yourself, obtain
 7   those estimates with regard to the
 8   demolition of the property?
 9        A     No.
10        Q     Okay.  Who obtained those if you
11   know?
12        A     My father.
13        Q     Okay.  Do you know why he
14   obtained estimates to demolish the
15   building?
16        A     Yeah, because I live in Florida,
17   and the property is in New York.  And he
18   has -- he knows a lot of people, and I
19   needed somebody to help me find someone.
20        Q     Have you been directed by the
21   town to demolish the home?
22        A     Not that I'm aware of.
23        Q     So if you're not being directed
24   to demolish the home by the town, do you
25   know why your father obtained estimates
```

Page 31

```
 1                    S. CONVERSE
 2   for its demolition?
 3        A    Because it's a total loss, and I
 4   was told that it couldn't be rebuilt.  It
 5   couldn't be salvageable.
 6        Q    Who told you it was a total
 7   loss?
 8        A    I can't remember.  Julio, I
 9   believe.
10        Q    But it's your intention -- and
11   correct me if I'm wrong -- not to demolish
12   the home but to repair it; correct?
13        A    It was my intention.
14        Q    Has your intention changed?
15        A    Yes, because I was told it's a
16   total loss, and it -- you can't save it.
17        Q    Okay.  I would call for the
18   production of any estimates that you may
19   have received or correspondence with
20   contractors with regard to the repair of
21   the property at 442 Flower Avenue East
22   from the date of loss through today, and
23   I'll put my request in writing.
24             MR. MCCARTHY:  Okay.
25   BY MR. WELCH:
```

```
 1                    S. CONVERSE
 2        Q    Ms. Converse, have you put a
 3    deposit down or retained anyone to
 4    demolish the home?
 5        A    No.
 6        Q    Prior to the fire, Ms. Converse,
 7    did you -- were the taxes and insurance
 8    paid out of the mortgage payment?
 9        A    Yes, they were escrowed in.
10        Q    Okay.  And prior to the fire,
11    Ms. Converse, on December 8, 2019, was the
12    property rented out to tenants?
13        A    Yes.
14        Q    Okay.  And how many floors was
15    the property?
16        A    Well, there's a basement.  I
17    don't know if you're going to count that
18    as a floor, but there's two floors.
19        Q    Okay.  And was there a tenant on
20    the second floor?
21        A    Yes.
22        Q    And was there a tenant on the
23    first floor?
24        A    Yes.
25        Q    Okay.  And the tenant on the
```

```
                                      Page 33
 1                   S. CONVERSE
 2    first floor, what was his or her name?
 3        A    Traci Rayburn.
 4        Q    Okay.  And the tenant on the
 5    second floor, his or her name, please?
 6        A    Larkin Harvey and Ariana
 7    Lawylor.
 8        Q    Okay.  And did you have a
 9    written lease agreement with Traci Rayburn
10    prior to the fire?
11        A    I don't believe so.
12        Q    What about with Larkin Harvey?
13    Did you have a written lease agreement
14    with her?
15        A    I did.
16        Q    Okay.  I would just call for the
17    production of any lease agreements between
18    the tenants, to the extent they have not
19    already been provided.
20             MR. MCCARTHY:  Okay.
21    BY MR. WELCH:
22        Q    And that lease agreement, was it
23    still in place -- meaning, was the term of
24    the lease still in place -- at the time of
25    the fire?
```

```
 1                    S. CONVERSE

 2        A     Yes.

 3        Q     Okay.  Did you consider Traci

 4   Rayburn to be a month-to-month tenant?

 5        A     Yes.

 6        Q     It's my understanding,

 7   Ms. Converse -- and please correct me if

 8   I'm wrong -- that prior to the fire,

 9   Ms. Rayburn had stopped paying rent; is

10   that correct?

11        A     Yes.

12        Q     When was the last month, if you

13   recall, she stopped paying rent?

14        A     I don't recall.

15        Q     Do you recall how many months

16   behind she was as of the date of the fire?

17        A     I don't recall.

18        Q     Prior to the fire, Ms. Converse,

19   when the tenants were paying rent, would

20   that be paid to you?

21        A     Yes.

22        Q     Okay.  Meaning, either given to

23   you or paid into an account that you

24   controlled; is that correct?

25        A      It was mostly my business
```

Page 35

1                     S. CONVERSE

2    account.

3         Q    Okay.  And were you the sole

4    owner of the business account?

5         A    Yes, with Richard as my

6    beneficiary.

7         Q    Richard was a beneficiary of

8    your business account?

9         A    He was a beneficiary of my life

10   insurance policy, which everything that I

11   have goes to him.

12        Q    Okay.  Let's just focus on the

13   business account.  Was that account

14   through a particular bank?

15        A    Northern Federal Credit Union.

16        Q    Okay.  And was that account

17   controlled by you?

18        A    Myself and my property manager.

19        Q    Okay.  Was Richard a signatory

20   on that bank account?

21        A    I can't remember if I put him on

22   or not, but there was -- when he let me

23   borrow the money, and he electronically

24   transferred it, I used that account, which

25   was Bank of America, to pay the mortgage

```
                                              Page 36
 1                      S. CONVERSE
 2   for the house.  So there were mortgage
 3   payments that came out of my personal
 4   account that was not through my business
 5   account.
 6        Q    Okay.  Is the -- your personal
 7   account, is that owned by you,
 8   individually?
 9        A    At the time, it was owned by
10   myself and Michael Rogers.
11        Q    Okay.  So it was not owned by
12   Richard; correct?
13        A    Correct.
14        Q    Okay.  And the funds that you
15   used to pay your mortgage would be drawn
16   from an account that Richard did not own
17   or control; correct?
18        A    Define that.
19        Q    Okay.  Ms. Converse, you would
20   pay the mortgage; correct?
21        A    Yes.
22        Q    Okay.  And that would be out of
23   an account, either a checking or savings
24   account, that you controlled; yes?
25        A    Yes.
```

S. CONVERSE

1

2     Q     Okay.  Richard's name was not on

3  that account; correct?

4     A     It was not on that account.

5     Q     And when the tenants would pay

6  you their share of the rent, it would be

7  deposited into an account that you

8  controlled, not Richard; correct?

9     A     Correct.

10     Q     Okay.  Ms. Converse, you had

11  earlier testified that in preparation for

12  your deposition today, you reviewed

13  certain house listings; correct?

14     A     Yes.

15     Q     Okay.  And those would be

16  listings for the sale of 442 Flower

17  Avenue; yes?

18     A     Yes.

19     Q     Okay.  Prior to -- well,

20  withdrawn.  Did you have any conversations

21  with Richard prior to the date of the fire

22  where you advised him or discussed with

23  him putting the property up for sale?

24     A     Yes.

25     Q     What was discussed?

```
 1                    S. CONVERSE
 2       A    Just that I was living in
 3  Florida.  It was hard for me to maintain,
 4  and he got married and started having
 5  kids.  And he -- we figured we would sell
 6  the property and just split the equity and
 7  wash our hands and be done with it.
 8       Q    This was a conversation the two
 9  of you had together?
10       A    Yes.
11       Q    Okay.  And he agreed at that
12  time to sell the property.
13       A    Yes.
14       Q    Okay.  Did you and he discuss
15  the amount that you would put it up for
16  sale for?
17       A    No, I don't believe so.
18       Q    Okay.  Did you discuss who you
19  would use, if anyone, to be broker?
20       A    I can't remember if we discussed
21  that.
22       Q    Do you recall if Mr. Converse
23  signed any broker agreements?
24       A    I don't know.  I don't recall.
25       Q    Did you sign any agreements with
```

```
 1                  S. CONVERSE
 2    any brokers to list a property for sale?
 3         A    Yes.
 4         Q    Okay.  Prior to the date of the
 5    fire, Ms. Converse, had the property been
 6    listed for sale on more than one occasion?
 7         A    Yes.
 8         Q    Okay.  How many occasions in all
 9    had it been listed for sale?
10         A    Well, please define that.
11    Because I had it listed on Craigslist for
12    rent, and on Craigslist, I put on there I
13    would be willing to sell it.  But it was
14    listed for rent.
15         Q    Okay.  So putting that one aside
16    then, did you sign more than one agreement
17    with a broker to list the home for sale
18    prior to the date of the fire?
19         A    I don't recall.  I can't
20    remember.
21         Q    Okay.  Ms. Converse, prior to
22    the date of the fire, would you include
23    the rental income you would receive from
24    the property on your personal income
25    taxes?
```

```
                                          Page 40
 1                    S. CONVERSE
 2        A     I'm sorry.   What was the
 3   question?
 4        Q     Sure.   Would you include the
 5   rent you'd receive from 442 Flower Avenue
 6   as income on your federal or state income
 7   taxes?
 8        A     Yes.
 9        Q     Okay.   Do you know,
10   Ms. Converse, if Richard would include the
11   income generated by the property as income
12   on his taxes?
13        A     I don't -- I don't know if he
14   did or not.
15        Q     The apartment -- let's just
16   stick with the first-floor apartment for
17   now.   When you rented that to Traci
18   Rayburn, was it furnished when you rented
19   it?
20        A     No.
21        Q     Okay.   Did it have appliances,
22   however?
23        A     Yes.
24        Q     Okay.   Stove, refrigerator?
25        A     Stove and refrigerator.
```

Page 41

1                    S. CONVERSE

2        Q    Okay.  Was there a washer and
3   dryer on the first floor?
4        A    Not that I --
5        Q    If you know.
6        A    Not that I put there.  If she
7   had some, then it was on her.
8        Q    Okay.  No, let's just stick with
9   things that you, as the landlord or the
10  owner of the property, may have installed
11  in the first floor.  That's all I'm really
12  looking at to understand --
13       A    I know.  I know, but I just
14  don't need the -- need it twisted around.
15       Q    Nothing's getting twisted
16  around.
17       A    Okay.
18       Q    Okay.  So it was rented -- the
19  first-floor unit was rented with a
20  refrigerator and a stove; yes?
21       A    Yes.
22       Q    Okay.  Any other appliances?
23       A    No.
24       Q    Okay.  No furniture; yes?
25       A    Yes.

1                    S. CONVERSE

2        Q     Okay.  And second-floor

3    apartment, was it also rented unfurnished?

4        A     Unfurnished with a stove and

5    refrigerator.

6        Q     Okay.  So it had appliances, but

7    not furniture; correct?

8        A     Correct.

9        Q     Okay.  And the same thing, you

10   indicated a stove and a refrigerator; yes?

11       A     Yes.

12       Q     Okay.  And as far as you know,

13   there was no washer and dryer present, or

14   at least, you did not have one in that

15   unit; correct?

16       A     Correct.

17       Q     Okay.  Was there a washer or

18   dryer provided in the building for the

19   tenants?

20       A     I can't remember if the washer

21   and dryer in the basement were from the

22   tenants or from Michael's ex-wife when she

23   lived there.

24       Q     Were the tenants -- so at some

25   point then, Michael's ex-wife lived in the

Page 43

```
 1                 S.  CONVERSE
 2   property and may have installed a washer
 3   and dryer in the basement; is that
 4   correct?
 5          A    Yes.
 6          Q    Okay.  And then this person left
 7   the property and left the washer and
 8   dryer; correct?
 9          A    Yes.
10          Q    Okay.  And if it wasn't removed,
11   they could have been used for the tenants;
12   correct?
13          A    Correct.  There was things that
14   her and her boyfriend did around the
15   property.  Because they were living there,
16   and we had an agreement about child
17   support with her living there.
18          Q    Okay.  So aside from the washer
19   and dryer that were in the basement, the
20   appliances you've already mentioned, did
21   either of the apartments come with any
22   other furnishings or property as a part of
23   the rental?
24          A    No.  A snowblower and a
25   lawnmower.
```

```
 1                     S. CONVERSE
 2        Q     Okay.  The snowblower you're
 3   referring to, where was that located prior
 4   to the fire, if you know?
 5        A     I don't know.  I wasn't there.
 6        Q     The lawnmower, where was that
 7   located prior to the fire, if you know?
 8        A     I don't know.
 9        Q     Do you know if either one or
10   both of those items were damaged as a
11   result of the fire?
12        A     I -- I don't know.  I didn't
13   look at them when I was up there.  I ...
14        Q     Okay.  Ms. Converse, I'm going
15   to show you some exhibits that were
16   previously marked at the deposition of
17   Richard Converse, and I'll have a few
18   questions for you.  Can you see my screen?
19        A     Yes.
20        Q     Okay.  And I'll represent to you
21   that this is a copy of the complaint -- I
22   can make it a little bit bigger if you
23   need it -- that was filed in this case by
24   you and Mr. Converse against State Farm
25   Fire & Casualty Company.  Just generally
```

Page 45

1                    S. CONVERSE
2    -- and I can scroll through it, so you can
3    see what it looks like -- have you seen
4    this document before?
5              (Exhibit RC0001 was previously
6              marked for identification.)
7        A    Not that exact one.
8        Q    Okay.  You've seen a version of
9    this then, this complaint?
10       A    Yes.
11       Q    Okay.  And do you recall if you
12   read this complaint prior to it being
13   filed?
14       A    I can't remember if it was
15   before or after.
16       Q    Okay.  Do you recall when you
17   read it, noting if there were any
18   inaccuracies in it?
19       A    I can't recall.
20       Q    Okay.  Just going through this
21   document -- we won't go through every
22   allegation here.  But the first paragraph
23   indicates that "at all times relevant
24   hereto, Plaintiffs Richard Converse and
25   Stephanie Converse are joint homeowners of

```
                                    Page 46
 1                 S. CONVERSE
 2   442 Flower Avenue East, Watertown, New
 3   York 13601."  Do you see that allegation?
 4       A    Yes.
 5       Q    Okay.  And that is correct, you
 6   were both joint owners of the property
 7   prior to the fire?
 8       A    Yes.
 9       Q    Okay.  I'm jumping down to
10   paragraph ten.  It says, "On October 31,
11   2019, Plaintiffs renewed their homeowners'
12   insurance policy through Defendants for
13   Plaintiff's property at 442 Flower Avenue
14   East."  Do you see that allegation?
15       A    Yes.
16       Q    Okay.  And again, you already
17   testified that the insurance was paid for
18   through the mortgage -- was escrowed
19   through mortgage; correct?
20       A    Yes.
21       Q    Okay.  Paragraph 11, "The
22   property is owned and operated by both
23   Plaintiffs as an apartment complex, where
24   Plaintiffs are landlords."  Do you see
25   that?  Do you see that allegation?
```

```
 1                    S. CONVERSE
 2      A     Yes.
 3      Q     Okay.  Was Richard a landlord?
 4            MR. MCCARTHY:  Form.  You can answer
 5      if you understand.
 6      A     Did he collect money and pay
 7   some of the bills directly?  No.  But did
 8   he have every action and has gone over to
 9   the property to -- if he needed to?  He
10   had full access, and he was able to talk
11   to the tenants as well.
12      Q     Okay.  And now it indicates,
13   "For all times relevant in this action,
14   Stephanie Converse has been primarily
15   responsible for the property management
16   obligations at the property."  Just with
17   respect to that allegation, is that
18   accurate?
19      A     I owned a property management
20   company.  That's -- that was my line of
21   business, so yes, I took care of it.
22      Q     Okay.  So as the person
23   primarily responsible for the property
24   management of the property, if the
25   tenants, prior to the fire, had any
```

```
                                    Page 48
 1                    S. CONVERSE
 2    complaints, they would bring those to you;
 3    correct?
 4         A    I had a property manager that
 5    started taking over, so they took the
 6    complaints to her.
 7         Q    Okay.  And that property manager
 8    worked for you?
 9         A    No, she did not.
10         Q    Who did she work for?
11         A    Herself.
12         Q    You owned a property management
13    company; is that correct?
14         A    Yes.
15         Q    And you employed a property
16    manager or no?
17         A    She used to work for me, Ginny
18    Frattali.  I moved to Florida, and I got
19    rid of my business.  I couldn't get good
20    tenants in there, and she took my book of
21    business with her.
22         Q    So if a tenant, prior to the
23    fire, had a complaint -- and let's just
24    stick with November of 2019.  If a tenant
25    had a complaint, right, who would they go
```

Page 49

                        S. CONVERSE

1

2    to?  You, the property manager, somebody

3    else?

4         A    I -- they would take it to her,

5    and then she would bring it to me.  And

6    then I would discuss it with Richard.

7         Q    Okay.  What would be -- well,

8    withdrawn.  Did you -- what was this

9    woman's name?

10        A    Ginny Frattali.

11        Q    Ginny.  And would you pay

12   Ms. Frattali for her services?

13        A    Yes.

14        Q    Okay.  And would she be paid by

15   you out of one of your personal accounts

16   or a business account or something else?

17        A    She would take it out of the

18   rents.

19        Q    Would she do that at your

20   direction?

21        A    Yes, I told her to.

22        Q    Okay.  Okay.  Paragraph 18 says,

23   "Following the extinguishing of the blaze,

24   the Watertown Fire Department issued a

25   report that demonstrated that the cause of

Page 50

1                        S. CONVERSE
2    the ignition was a cigarette that was
3    inadvertently thrown in the trash.  The
4    report went on to confirm that the cause
5    of the ignition was unintentional, and
6    when asked if there were human factors
7    contributing to ignition, the report
8    stated that there were none."  And then it
9    says, "A copy of the fire report is
10   attached hereto as Exhibit B."  Do you see
11   that allegation, Ms. Converse?
12        A    Yes.
13        Q    Are you familiar with the fire
14   report that is referred to in this
15   allegation?
16        A    I just found out about it.
17        Q    Okay.  I don't want to know any
18   conversations you may have had with your
19   counsel.  Okay?  So if that's what you're
20   referring to, then I won't ask any further
21   questions about that.  Just, were you
22   aware of whether or not the fire
23   department had issued more than one fire
24   report?  Just aware of it.
25        A    No.

Page 51

1                    S. CONVERSE

2        Q    Okay.  Have you seen a copy of

3   the fire marshal's -- any supplemental

4   report by the marshal?

5        A    No.  And when did that fire

6   report change again?

7        Q    We'll look at it.  I'll show you

8   a copy of it together.  Okay.  And

9   paragraph 20, I'm just going to read this

10  to you.  It says, "As is required by

11  Plaintiffs' insurance claim with

12  Defendant, Plaintiffs began cooperating

13  with Defendants on December 11, 2019, to

14  assist in Defendant's investigation of

15  Plaintiffs' claim.  Plaintiffs'

16  cooperation included a December 11, 2019,

17  interview with Defendant's agent Julio

18  Loarca regarding the claim."  Do you see

19  that paragraph, Ms. Converse?

20       A    Yes.

21       Q    Okay.  This indicates that you

22  had an interview with Julio Loarca on or

23  about December 11, 2019; correct?

24       A    Correct.

25       Q    Okay.  Do you recall giving that

Page 52

```
 1                    S. CONVERSE
 2   interview to Mr. Loarca?
 3        A    Yes.
 4        Q    Okay.  Do you recall if that
 5   interview was recorded?
 6        A    Yes.
 7        Q    Okay.  Paragraph 22,
 8   Ms. Converse, reads, "Prior to the
 9   examination under oath, Plaintiff
10   Stephanie Converse retained legal counsel,
11   who, among other tasks, assisted in the
12   production of the information contained in
13   the 'proof of loss' for the fire."  Do you
14   see that allegation, Ms. Converse?
15        A    Yes.
16        Q    Who was the -- do you know who
17   the attorney is that's being referenced
18   here?
19        A    Eric Schwartz.
20        Q    Okay.  When did you retain
21   Mr. Schwartz if you recall?
22        A    January 2nd.
23        Q    That would have been January 2nd
24   of 2020?
25        A    Yes.
```

Page 53

```
 1              S. CONVERSE
 2      Q    Okay.  Was that also the date
 3   that you gave a statement to the Lea
 4   County Sheriff's Office?
 5      A    Yes.
 6      Q    And Mr. Schwartz assisted in the
 7   production of information contained in the
 8   quote, "proof of loss," unquote, for the
 9   fire; is that correct?
10      A    Yes.
11      Q    Okay.  Now, Ms. Converse, after
12   State Farm issued payment to the bank, the
13   mortgage holder here, did you owe the bank
14   any more money on the mortgage?
15      A    After State Farm paid them off?
16      Q    Yeah.
17      A    No.
18      Q    Okay.  Paragraph 30 reads,
19   "Under the terms of the insurance policy,
20   Plaintiffs are entitled to the fair market
21   value of the property at the time of loss,
22   less any payoff to the mortgage lender.
23   Upon information and belief, the fair
24   market value of the property as of
25   December 19, 2019, was $150,000; however,
```

```
                                        Page 54
 1                    S. CONVERSE
 2    the exact value, and thus Plaintiffs'
 3    damages, should be determined upon inquest
 4    by this Court."  Okay.  Do you see that
 5    paragraph, Ms. Converse?
 6         A    Yes.
 7         Q    Do you know how that fair market
 8    value was arrived at of $150,000?
 9              MR. MCCARTHY:  I'll object to the
10         form and -- yeah, just I'll object to the
11         form.  You can answer if you know the
12         answer to how that came up.
13         A    I -- I can't answer that.
14         Q    Okay.  Have you, Ms. Converse,
15    reviewed your policy of insurance with
16    State Farm?
17         A    I can't remember if I did after
18    the fire or not.  I know that I reached
19    out to State Farm and asked for a copy of
20    it.
21         Q    Okay.  But you don't recall if
22    you reviewed it, a copy?
23         A    I didn't verbatim, but I skimmed
24    through it.
25         Q    After the fire?
```

```
 1                    S. CONVERSE
 2       A     Correct.
 3       Q     Okay.  Okay.  Paragraph 31 says,
 4  "Plaintiffs utilized the location for two
 5  apartments, both of which were occupied by
 6  tenants at the time of the fire.  The
 7  tenants paid $900 and $850 per month
 8  respectively, resulting in $19,250 in loss
 9  of use of rental income annually."  Okay.
10  Which tenant was paying $900 a month?
11       A     Downstairs.
12       Q     Okay.  So that would be Traci
13  Rayburn?
14       A     Yes.
15       Q     Okay.  And she was the
16  month-to-month tenant that had stopped
17  paying rent a few months before the fire;
18  correct?
19       A     Yes.
20       Q     Okay.  And the 850 then, that
21  would be for Larkin Harvey?
22       A     Yes.
23       Q     Okay.  Was she up to date as of
24  the date of the fire?
25       A     Yes.
```

Page 56

1                    S. CONVERSE

2         Q    Okay.  Paragraph 32 reads,
3    "Additionally, Plaintiffs lost a
4    substantial amount of personal property in
5    the fire, which included, among other
6    things, furniture and appliances for both
7    apartments, washers and dryers in each
8    apartment, as well as a snowblower that
9    could not be recovered from the fire."
10   Just that first sentence, Ms. Converse,
11   based on your testimony today, it's my
12   understanding that there was no furniture
13   of yours or Richard's lost in the fire;
14   correct?

15        A    There was not furniture in the
16   apartments, but I still had stuff in the
17   basement.

18        Q    Okay.  What stuff did you have
19   in the basement that was furniture?

20        A    Personal property.  I can't
21   remember exactly what it was, 'cause I
22   moved out years and -- way before that.

23        Q    Are you making a claim in
24   connection with this litigation for damage
25   to some furniture in the basement?

```
                                    Page 57
 1                    S. CONVERSE
 2        A     Yes.
 3        Q     Okay.  Can you specify exactly
 4   what was damaged?
 5        A     What was the question?
 6        Q     Sure.  You had indicated -- I
 7   can repeat it -- that prior to moving out,
 8   you had, I guess, at some point stored
 9   some personal belongings in the basement.
10   Can you give me a list of furniture at
11   least that was yours that may have been
12   damaged after the fire in the basement?
13        A     I can't give you exactly.
14        Q     Okay.  Since the date of the
15   fire until today, Ms. Converse, have you
16   prepared a list of any of your personal
17   property that may have been damaged as a
18   result of the fire?
19        A     I was the one that listed the
20   snowblower and the washer and dryers and
21   some of the furniture, but I can't
22   remember exactly with the furniture.
23   Because my boyfriend's ex-wife lived
24   there, and I took off some of the rent for
25   her putting the washer and dryers there.
```

```
 1                    S. CONVERSE
 2        Q    Okay.  Let's just stick to the
 3   furniture.  Do you recall what furniture
 4   is being referred to in paragraph 32 that
 5   was damaged as a result of the fire, that
 6   you're making a claim for in this
 7   litigation?
 8        A    I had a table and chairs.  There
 9   was, I believe, a bookcase and end tables.
10        Q    Okay.  And were these items
11   damaged as a result of the fire?
12        A    Yes, they were in the basement.
13        Q    Okay.  And have you made a list
14   of these items, like a written list of
15   these items?
16        A    I would have to look through my
17   e-mails to see if I did.
18        Q    Okay.  When did you last live at
19   442 Flower Avenue?
20        A    I can't remember.
21        Q    Well, you were living in
22   Preserve Way in 2019; correct?
23        A    Yes.
24        Q    Okay.  Did you live in New York
25   in 2019 at all?
```

```
                                       Page 59
 1                   S. CONVERSE
 2        A     No.
 3        Q     Did you live in New York in
 4   2018?
 5        A     No.
 6        Q     Did you live in New York in
 7   2017?
 8        A     I'm -- for a little time, yes.
 9        Q     Okay.  Would these items that
10   you're referring to, the table and chairs,
11   bookcase, and end tables, have been placed
12   in the basement prior to you leaving New
13   York for Florida?
14        A     Yes.
15        Q     Paragraph 32 references
16   appliances for both apartments, which
17   we've already discussed.  It also says,
18   "washers and dryers in each apartment."
19   Based on your earlier testimony,
20   Ms. Converse, it's my understanding that
21   there were no washers and dryers in the
22   apartments; correct?
23        A     There's no washer and dryer
24   hookups in Larkin Harvey's apartment, so
25   they're -- the washer and dryers were in
```

```
 1                    S. CONVERSE
 2   the basement for that one.  In Traci's
 3   apartment, there was a washer and dryer.
 4   She had hookups, and there was a washer
 5   and dryer in there.
 6        Q    Okay.  But those would have been
 7   hers, not yours.
 8        A    I can't -- were they mine?  I
 9   think they were mine, because the tenant
10   that lived there prior to Traci, I took
11   money off rent in -- in agreement -- what
12   was it?  Yeah, I took money off rent for
13   her to have a washer and dryer in there.
14        Q    Okay.  Do you know if she had
15   one or not, a washer and dryer?  Only if
16   you know.  If you don't know, you can just
17   say you don't know.  It's okay.
18        A    I don't know.
19        Q    All right.  Have you prepared,
20   in connection with this litigation, a
21   specific list of the personal property
22   items you are claiming, together with
23   their values?
24        A    I had sent my attorney a list of
25   some stuff that was in there.
```

Page 61

```
1                    S. CONVERSE
2        Q    Do you know if that list had
3    values attached to it?
4        A    I believe so.
5             MR. WELCH:  Okay.  I would just call
6        for the production of any lists or
7        itemization of Ms. Converse's contents
8        claim with valuations that are being
9        sought in connection with this litigation.
10       I'll put my request in writing.
11            MR. MCCARTHY:  Yes, yes.  And I think
12       you said it, but please put it in writing.
13       But yes.
14            MR. WELCH:  Sure, yep.
15            THE WITNESS:  May we please have a
16       break?
17            MR. WELCH:  Oh, of course.  Yeah.
18       Want to take -- I don't know -- five-ten
19       minutes to use the restroom?
20            MR. MCCARTHY:  Okay.
21            THE WITNESS:  Yeah, like ten minutes.
22       Thanks.
23            MR. WELCH:  Sure.
24            THE REPORTER:  We are off the record
25       at 11:11.
```

Page 62

```
 1                    S. CONVERSE
 2           (Off the record.)
 3           THE REPORTER:  We are back on the
 4      record at 11:22 a.m.
 5  BY MR. WELCH:
 6      Q    Okay.  I'm going to be taking
 7  down the complaint and bringing up what's
 8  been previously marked as RC0001.  The
 9  complaint was actually -- I mean, excuse
10  me.  The complaint was RC0001.  The is
11  going to be RC0002, and I would like to
12  show this to you, Ms. Converse, and ask
13  you if you recognize it.  The top of the
14  second page states, "Warranty Deed," and
15  it says, "This indenture, made February
16  21, 2021, between Stephanie Converse and
17  Richard Converse and SJ Converse Realty,
18  LLC."  Do you see this document?
19           (Exhibit RC0002 was previously
20           marked for identification.)
21      A    I do.
22      Q    Do you know what it is?
23      A    Yes.
24      Q    What is it?
25      A    It's -- I transferred the
```

```
 1                    S. CONVERSE
 2   property over into my business account.
 3        Q    And did Richard also transfer
 4   his ownership interest in the property
 5   into your business account?
 6             MR. MCCARTHY:  Object to the form,
 7        but you can answer.
 8        A    I -- can you ...
 9        Q    Sure.  I'll rephrase.  This is a
10   deed -- it looks like -- between you and
11   Richard as grantors, and SJ Converse
12   Realty LLC as grantee.  Do you see that?
13        A    Yes.
14        Q    Okay.  Do you know what that
15   means?
16        A    Yeah.
17        Q    What does it mean?
18        A    Richard and I transferred the
19   property into my business account.
20        Q    Okay.  SJ Converse Realty LLC,
21   is that a company that you own?
22        A    Yes.
23        Q    Okay.  Is Richard an owner of
24   that company?
25        A    No.
```

```
                                    Page 64
 1                  S. CONVERSE
 2        Q     Okay.  Are there any other
 3   owners of the company?
 4        A     No.
 5        Q     Okay.  Do you know -- so as of
 6   February 21, 2021, Richard is no longer an
 7   owner of the property; correct?
 8        A     No.  It's my company.
 9        Q     Right.  Your company, SJ
10   Converse Realty, own 442 Flower Avenue;
11   correct?
12        A     Correct.
13        Q     Okay.  Do you know why Richard
14   agreed to transfer his ownership interest
15   into your company, SJ Converse Realty?
16        A     We both wanted to.
17        Q     Do you know why he wanted to?
18   Or I'll withdraw the question.  Why did
19   you want to transfer the property from
20   both of your ownership to SJ Converse
21   Realty?
22        A     We both wanted to transfer it,
23   'cause we didn't want a burnt house in our
24   name sitting there for years like it has
25   been.
```

Page 65

S. CONVERSE

1

2     Q     Okay.  Did you pay Richard

3  anything for his interest in the property,

4  to transfer his interest in the property

5  to you?

6     A     No.

7     Q     Okay.  Does SJ Converse Realty

8  LLC own any other properties?

9     A     No.

10    Q     Do you know if -- does SJ

11  Converse Realty have insurance on the

12  property?

13    A     Now?

14    Q     Yes.

15    A     No.

16    Q     All right.  I'll close out that

17  document.  Ms. Converse, I'd like to show

18  you what was previously marked at the

19  deposition of Richard Converse as RC0004.

20  This is an eight-page document, and I

21  would like to show you portions of it.

22  First of all, do you recognize what's

23  being shown here as RC0004?  And this is

24  page two.  I'll show you page three.  This

25  is page four, five, six.  Looks like seven

Page 66

                    S. CONVERSE
1
2    and then the eighth page.  Do you
3    recognize this document?
4              (Exhibit RC0004 was previously
5              marked for identification.)
6         A    Yes.
7         Q    Okay.  And is this a copy of the
8    fire report with regard to the fire at 442
9    Flower Avenue?
10        A    Yes.
11        Q    Okay.  And it looks like this
12   report notes that the date of the fire is
13   December 8, 2019.  Do you see that at the
14   top here?
15        A    Yes.
16        Q    Okay.  And it looks like under
17   date and time, section E-1, it looks like
18   there is a notation for the alarm as
19   having been received at 12:48 p.m.  Do you
20   see that?
21        A    Yes.
22        Q    Okay.  Do you recall -- well, do
23   you know what time the fire started?  I'll
24   withdraw.  Let me ask you this.  Do you
25   know what time the fire was observed at

```
 1                    S. CONVERSE
 2    the property?  First observed.
 3         A    It was in the morning, 'cause I
 4    was coming back from brunch with
 5    coworkers.
 6         Q    Okay.  And taking a look at --
 7    excuse me.  I'm going to show you page
 8    three of eight.  There is a section,
 9    section Like, labeled "Remarks."  And on
10    the notation for October 13, 2020, the
11    report reads, "The cause of the fire was
12    changed to reflect the findings of the
13    investigation team.  The original fire
14    report had the fire listed as
15    unintentional with a cigarette as the
16    ignition source.  While this cannot be
17    ruled out, it also cannot be confirmed.
18    Our office was also provided with evidence
19    that brings in other possible scenarios."
20    Do you see that paragraph, Ms. Converse?
21         A    Yes.
22         Q    Have you seen this document
23    before?  Or withdrawn.  Have you seen that
24    particular paragraph from the fire report
25    before?
```

Page 68

1                    S. CONVERSE

2        A    Our offices was also provided

3   with evidence that brings in other

4   possible scenarios.  That one?

5        Q    Just this paragraph that starts

6   with the date of October 13, 2020, right

7   through the end where it says, "BC Michael

8   Kellogg."  Have you seen that particular

9   part --

10        A    I have not.

11        Q    Okay.

12        A    So that's when he revised it was

13   on October 13th of 2020?

14        Q    I do not know.  I'm only

15   wondering if you had seen it before

16   yourself.

17        A    I have not seen it, but I think

18   it's such a coincidence that it got

19   changed without my knowledge.  And in that

20   very same week, I submitted a complaint to

21   New York State against State Farm, and

22   then just all the sudden a week later, the

23   fire report changes.

24        Q    Okay.  It sounds like you're

25   just speculating.  Do you have any

```
 1                    S. CONVERSE
 2   information as you sit there today that
 3   State Farm contacted the fire marshal and
 4   had this report altered in some way?
 5        A    I don't know if he --
 6             MR. MCCARTHY:  Form.  You can answer.
 7             THE WITNESS:  I don't know if he
 8        contacted them directly, but I do know
 9        that Julio Loarca went to the fire
10        department and spoke to one of the
11        gentlemen.
12   BY MR. WELCH:
13        Q    Okay.  That wasn't my question.
14   My question was, do you know -- as you sit
15   there today where you are, do you have any
16   evidence that State Farm reached out to
17   the fire marshal and had them alter this
18   report on or about October 13, 2020?  It's
19   a yes or no question.
20        A    Give me a minute to think.
21        Q    Sure.
22        A    Do you mind if I go back through
23   my e-mails?
24        Q    You'd have to produce them if
25   you want to look at it.  Do you have a --
```

```
 1                   S. CONVERSE
 2   my question to you is, do you have any
 3   recollection without looking at your prior
 4   e-mails, whether or not you have evidence
 5   that would support your statement that you
 6   believe -- withdrawn.  Do you have any
 7   evidence without looking at these e-mails
 8   you want to refer to that State Farm
 9   reached out to the fire marshal on or
10   about October 13, 2020, and had this
11   report altered?
12        A    I have something, but I'd -- I
13   can't remember exactly what it is.  So I
14   can't give you an exact answer.  I would
15   have to send you the documents.
16        Q    Okay.  So you'd have to look at
17   your e-mails to be able to substantiate
18   what you believe to be a communication
19   between State Farm and the fire marshal
20   around this time?
21        A    Yes.
22        Q    Okay.  Do you know -- only if
23   you know -- what -- where this paragraph
24   reads, "Our office was also provided with
25   evidence that brings in other possible
```

```
                                          Page 71
 1                    S. CONVERSE
 2   scenarios."  Do you know what that refers
 3   to?
 4        A    The letter?
 5        Q    Okay.  What letter is that?
 6        A    It was a written letter that I
 7   had put inside Joe's birthday card.
 8        Q    Okay.  And Joe, would that be
 9   Joe Pelton?
10        A    Yes.
11        Q    And the letter, would that be a
12   letter that you wrote to Joe, asking him
13   to set your house on fire?
14             MR. MCCARTHY:  Form.
15        A    It was a letter that I wrote
16   when I was intoxicated.  I know I
17   shouldn't have written it.
18        Q    And do you know what the
19   substance of that letter was that you
20   wrote when you were intoxicated?
21        A    I do --
22             MR. MCCARTHY:  Form.  You can answer.
23             THE WITNESS:  I do, because I went
24        under both with Mr. Mura, and he showed me
25        the documentation, as well as the sheriffs
```

Page 72

                              S. CONVERSE

1

2         did.

3    BY MR. WELCH:

4         Q     Okay.  When you say, "the

5    sheriffs did," are you referring to the

6    Lea County Sheriff's Office?

7         A     Yes, sir.

8         Q     Okay.  They showed you a copy of

9    the letter?

10        A     Yes.

11        Q     Okay.  And this was at the time

12   that they took a statement from you; is

13   that correct?  Or some other time?

14        A     At the time they took the

15   statement on January 2, 2020.

16        Q     Okay.  Ms. Converse, when the

17   Lea County Sheriff's Office took a

18   statement from you on January 2, 2020,

19   were you intoxicated at that time?

20        A     I was not.

21        Q     Okay.  When Mr. Loarca took your

22   recorded statement after the fire, were

23   you intoxicated when you gave that

24   statement?

25        A     I can't remember.

```
 1                    S. CONVERSE
 2        Q    Okay.  Ms. Converse, showing you
 3   what was previously marked at the
 4   deposition of Richard Converse as Exhibit
 5   RC0003.  Is this a copy of the letter that
 6   you are referring to?
 7                (Exhibit RC0003 was previously
 8                marked for identification.)
 9        A    Yes.
10        Q    Did you discuss this letter with
11   Richard after his deposition?
12        A    Yes.
13        Q    And did he ask you why you wrote
14   this letter?
15        A    Yes.
16        Q    Did you tell him?
17        A    Yes.
18        Q    Prior to his deposition,
19   Ms. Converse, had you ever told Richard
20   that you had sent this letter to Joe
21   Pelton?
22        A    I told him I sent him a birthday
23   card.
24        Q    Okay.  Did you tell him that the
25   birthday card included a letter?
```

Page 74

                        S. CONVERSE

1

2      A    I can't remember if I did or

3   not.

4      Q    Did Mr. Converse express

5   surprise to you after his deposition that

6   you had sent this letter to Joe Pelton?

7      A    Yeah.

8      Q    Okay.  So, Ms. Converse, based

9   on your testimony, it's my understanding

10  -- and please correct me if I'm wrong --

11  that this copy of this letter, was it

12  folded into a birthday card or something?

13     A    Yes.

14     Q    Okay.  This particular letter

15  doesn't actually say the words, "Happy

16  Birthday" on it.  Would you agree with

17  that?

18     A    Yes.

19     Q    Okay.  Now here, Ms. Converse,

20  this letter states, "Joe, how have you

21  been?  I miss you.  Hope all is well and

22  you're doing good.  Having issues with my

23  house again.  Need help this time.  I will

24  pay you 5,000 cash when I get the

25  insurance.  The back door will be unlocked

```
 1                    S. CONVERSE
 2   and open to the basement.  That's where
 3   the access to utilities are.  Tuesday and
 4   Wednesday are good during day.  Make look
 5   like electrical.  I will come up after it
 6   happens, so I will meet up with you.
 7   Property is at" -- it looks like it's cut
 8   off, but I believe it says -- "442 & 444
 9   Flower Avenue East.  It's a mint green
10   house with garage.  Love you.  See you
11   soon.  Stephanie."  Okay.  Is that your
12   signature on this letter?
13        A    Yes.
14        Q    Okay.  Prior -- well, and my
15   understanding is that this letter was sent
16   on or about October -- excuse me -- on or
17   about November 8, 2019.  Is that your
18   recollection of when the letter was sent?
19        A    I can't remember when I sent it.
20        Q    Okay.  Do you recall in November
21   of 2019, assuming that's when it was sent
22   given the postmark on it, whether or not,
23   as of that time, you had plans to come to
24   New York?
25        A    I did have plans to come to New
```

Page 76

```
                        S. CONVERSE
 1
 2    York prior to that.
 3         Q    Okay.  And what was the purpose
 4    of your -- what was going to be the
 5    purpose of your trip to New York?
 6         A    I was going in February to
 7    surprise my mother for her birthday on
 8    February 20th, which I did.
 9         Q    Okay.  As of -- you mean you
10    traveled to New York in February?
11         A    Yes, 'cause I wanted to do my
12    EUO in person, but Mura insisted we did it
13    in Florida.
14         Q    Oh, he insisted on that.  Is
15    that your testimony?
16         A    It's not my testimony, it is.
17         Q    Okay.  And this trip you had
18    planned for February, when were you
19    supposed to come up?  Well, withdrawn.
20    Were you supposed to fly, drive?  How were
21    you going to get to New York?
22         A    I was flying.  My father bought
23    the ticket -- bought my ticket.
24         Q    Okay.  Do you recall when your
25    father purchased that ticket?
```

Page 77

```
 1                      S. CONVERSE
 2        A    I cannot recall.
 3        Q    Okay.  Do you know if he -- did
 4   he send you a flight confirmation after he
 5   purchased it?
 6        A    I have it somewhere.
 7             MR. WELCH:  Okay.  I'm going to call
 8        for the production of any e-mails or other
 9        communications by and between Ms. Converse
10        and her father -- or really the airline --
11        with regard to the flight confirmation and
12        flight that was to have been taken or that
13        she actually did take in February of 2020.
14        And I'll put my request in writing.
15   BY MR. WELCH:
16        Q    But you don't know when he
17   actually purchased that ticket; correct?
18        A    I can't recall.
19        Q    Okay.  Was there any other
20   reason why you were intending to come to
21   New York in February of 2020?
22        A    No, I was coming up to surprise
23   my mother for her birthday, 'cause I
24   hadn't been home in a while.
25        Q    Okay.  It was not your intention
```

```
 1                    S. CONVERSE
 2   to come up to New York to pay Mr. Pelton
 3   for setting your house on fire?
 4        A    No, that was not my intention,
 5   and I didn't even see Joe or talk to him
 6   when I was even up there.
 7        Q    Okay.  Because this letter that
 8   was sent to Mr. Pelton suggests that
 9   you're going to "come up after it happens"
10   -- I'm assuming that means the fire -- and
11   meet up with him at that time.  Would you
12   agree with that statement, that's what the
13   letter suggests?
14        A    That's what it says in the
15   letter.
16        Q    Okay.  And here, this letter
17   indicates that you would have given him
18   $5,000 out of the insurance proceeds;
19   correct?
20        A    That's what it shows, yes.
21        Q    Okay.  Ms. Converse, after you
22   sent this letter to Mr. Pelton -- and
23   again, the postmark is dated November 8,
24   2019, did you have conversations with him
25   on the phone with regard to what you
```

```
 1                    S. CONVERSE
 2   requested in this letter?
 3        A     Before or after?
 4        Q     After the letter was sent, did
 5   you have conversations with Mr. Pelton
 6   with regard to what you're requesting he
 7   do in this letter?
 8        A     That happened so long ago, I --
 9   I can't remember times of when I've talked
10   to him.
11        Q     So you don't know if you've
12   spoke to him on the phone after you sent
13   the letter, following up with regard to
14   its contents?
15        A     I can't remember.
16        Q     Do you recall, Ms. Converse,
17   whether or not you told the detectives
18   from the Lea County Sheriff's Office that
19   you had two phone calls with him after
20   this letter was sent and prior to the
21   fire?
22        A     I remember -- I recall telling
23   them that I talked to him after the fire
24   to make sure he didn't do it.
25        Q     Do you recall telling them that
```

```
                                    Page 80
```

2   you had conversations with him after you

3   sent this letter, asking him to do it?

4            MR. MCCARTHY:  Form.  You can answer

5        if you understand.

6        A    I don't recall.

7        Q    Okay.  So you only recall the

8   conversation you had after the fire,

9   asking him if he -- well, withdrawn.  Did

10  you call him after the fire, asking him if

11  he did do it?

12       A    I called him crying after the

13  fire.  I don't know how I worded it with

14  him.  I'm pretty sure I said, "Please tell

15  me it wasn't you.  Please tell me you

16  didn't do it."

17       Q    Do you recall if you spoke to

18  him on the day of the fire or sometime

19  after that?

20       A    I can't recall.  At the day of

21  the fire, I was -- like I mentioned

22  earlier, I was at brunch with coworkers,

23  and we were having mimosas at brunch.

24       Q    And you don't know if you spoke

25  to him on the day of the fire or sometime

```
 1                    S. CONVERSE
 2   after that day?
 3        A    I can't recall.  I don't know.
 4   I was in --
 5        Q    Okay.  When you -- go ahead.
 6   You can finish.
 7        A    I was in a little bit of shock
 8   when I found out.  I was coming back from
 9   brunch, and I had to pull over and -- the
10   time --
11        Q    Were you in shock at that time,
12   because you weren't sure whether or not
13   her actually did it?
14        A    That didn't even come across my
15   mind one bit.  My shock was more towards
16   the tenants and people getting hurt.  I
17   wanted to make sure everybody was okay.
18        Q    Did the thought ever cross your
19   mind, Ms. Converse, after you heard of the
20   fire, that Mr. Pelton was the one who set
21   the house on fire?
22        A    Not once.
23        Q    Not once, despite the fact that
24   you sent him this letter, asking him to do
25   it?
```

Page 82

                        S. CONVERSE

1
2        A     Yeah, because I don't remember
3    writing that letter.  And I know I should
4    have mentioned it before.  There was a lot
5    of things that I don't remember and a lot
6    of things that I regret.  I ended up
7    seeking help and counseling for my
8    addiction, so ...
9              MR. WELCH:  Okay.  I'm going to move
10        to strike that portion of the testimony.
11        It's not responsive to my questions.
12    BY MR. WELCH:
13        Q    Okay.  Ms. Converse, on the day
14    of the fire, did you believe -- or
15    withdrawn.  After you first heard of the
16    fire, did you believe that one of your
17    tenants may have been responsible?
18        A    I thought the downstairs tenant,
19    Traci, did it.
20        Q    Okay.  And you thought Traci did
21    it, despite the fact that this letter had
22    been sent to Mr. Pelton, asking him to do
23    it; is that correct?
24              MR. MCCARTHY:  Form.  You can answer.
25        A    Please rephrase that.

```
 1                    S. CONVERSE
 2        Q    Sure.  You acknowledge that
 3   there was this letter that was sent to
 4   Mr. Pelton, asking him to set the fire;
 5   correct?
 6        A    I don't remember sending it, so
 7   I can't say that I acknowledge remembering
 8   sending it.
 9        Q    Okay.  So you don't remember
10   sending the letter, and you also don't
11   remember calling him after you sent the
12   letter to him but prior to the fire; is
13   that correct?
14             MR. MCCARTHY:  Form.
15   BY MR. WELCH:
16        Q    You can answer.
17        A    That's correct.
18        Q    Ms. Converse, if you don't
19   recall sending Mr. Pelton the letter --
20   well, withdrawn.  You do recall speaking
21   to Mr. Pelton after the fire; correct?
22        A    Yes.
23        Q    Why would you speak to him after
24   the fire if you didn't recall sending him
25   this letter about setting the fire?
```

```
                          S. CONVERSE
 1
 2        A     Because when Joe lived down here
 3   in Florida, he lived with me, and we would
 4   joke about it once in a while.
 5        Q     So based on your prior
 6   conversations with Joe when he used to
 7   live with you about -- well, withdrawn.
 8   I'm sorry.  You were joking around with
 9   Joe about setting the house on fire when
10   he used to live with you in Florida?
11        A     Yeah, it's in my -- it should be
12   in the report with the sheriffs as well.
13        Q     Okay.  This is something you
14   would joke about, setting a house on fire?
15             MR. MCCARTHY:  Form.  Let's just -- I
16        mean --
17             MR. WELCH:  That's what I'm asking --
18             MR. MCCARTHY:  -- she answered the
19        question.
20   BY MR. WELCH:
21        Q     Go ahead.  You can answer.
22        A     Well, it's like when you're mad
23   at somebody, you say, "Oh, I -- I just
24   want to kill you" or "I could kill you."
25   Doesn't mean you're going to go out and
```

```
                                      Page 85
 1                  S. CONVERSE
 2    kill them; right?  So I was upset with the
 3    tenant not paying me rent, and it was
 4    basically -- it would be a joke.
 5         Q    Okay.  But based on these prior
 6    conversations where you were just joking
 7    with Mr. Pelton about setting the house on
 8    fire, you felt as though you should call
 9    him afterward to, what, find out if he did
10    it or not?
11              MR. MCCARTHY:  Form.
12         A    I don't know why I called him.
13         Q    Withdraw.  Why did you call
14    Mr. Pelton --
15              MR. MCCARTHY:  She already testified
16         to the conversation that she had
17         afterwards.
18    BY MR. WELCH:
19         Q    Why did you call Mr. Pelton
20    after the fire?
21         A    I don't know.  He's friends --
22    really good friends with Michael.
23         Q    Ms. Converse, do you have
24    Mr. Pelton's cell phone number?
25         A    I -- right -- right now?
```

```
 1                  S. CONVERSE
 2      Q    Sure.
 3      A    I don't know.  I'd have to look
 4  through my phone.
 5            MR. WELCH:  Okay.  Well, I'm going to
 6       ask that a space be left in the
 7       transcript, and for Ms. Converse to put in
 8       Mr. Pelton's cell phone number.
 9  BY MR. WELCH:
10      Q    Ms. Converse, do you know if
11  Mr. Pelton has the same cell phone number
12  today that he had back in 2019?
13      A    I don't know.
14      Q    Okay.  To the extent that you
15  have one or more phone numbers, I'd ask
16  that you provide them all in the space
17  that'll be provided in the transcript.
18  Okay?  Thank you.  Ms. Converse, prior to
19  -- well, withdrawn.  Do you know how your
20  father paid for the plane tickets?  Was it
21  through a credit card, debit card,
22  something else?
23      A    Credit or debit card.
24      Q    And was that a trip that was
25  just for you, or were other people going
```

Page 87

                        S. CONVERSE

1                        S. CONVERSE

2   to come with you?

3        A    My son was coming with me.

4        Q    And did your father buy him a

5   ticket as well?

6        A    Wait.  Did Keegan come?  I can't

7   remember if my son came or not for that

8   trip.

9        Q    Okay.  After the trip that you

10  came up for your mother's birthday in

11  February, when was the next time you came

12  up to New York after that?

13       A    I can't remember.  I don't think

14  it was until -- I can't remember.

15       Q    Okay.  Since you moved to

16  Florida in or about 2017 up until the date

17  of the fire, had you been back to New York

18  to visit?

19       A    From 2017 when I moved?

20       Q    Yes.

21       A    Up until the fire?

22       Q    Yes.

23       A    Yes.

24       Q    Okay.  How many times did you

25  come up to New York during that period of

```
                                        Page 88
 1                   S. CONVERSE
 2   time if you recall?
 3        A    I can't remember.
 4        Q    Okay.  Ms. Converse, showing you
 5   what was previously marked at
 6   Mr. Converse's deposition as RC0005.  It's
 7   a copy of an exclusive right to sell
 8   contract.  Do you see this document?
 9             (Exhibit RC0005 was previously
10             marked for identification.)
11        A    Yes.
12        Q    Okay.  Do you recognize it?
13        A    Yes.
14        Q    Okay.  Is it a copy of a right
15   to sell contract that was assigned by you?
16        A    Yes.
17        Q    Okay.  Taking a look at the
18   bottom, Ms. Converse, do you see that
19   there's a signature that appears next to
20   the date of June 5, 2019?
21        A    Yes.
22        Q    Is that your signature?
23        A    It looks like a scribble, but I
24   know I signed it.
25        Q    Okay.  Do you have any reason to
```

```
                                    Page 89
 1                   S. CONVERSE
 2   believe that you did not sign this
 3   document?
 4        A     No.
 5        Q     Okay.  Now there's another space
 6   for a second owner's signature.  Do you
 7   see that as blank?
 8        A     Yes.
 9        Q     Do you know why Richard was not
10   asked to sign this exclusive right to sell
11   contract as a co-owner of the property?
12              MR. MCCARTHY:  Form.  You can answer
13        if you understand.
14        A     He didn't sign it, because he
15   was not asked to by Jason Smith.
16        Q     Okay.  Did you ask him to sign
17   it, given that he was a co-owner of the
18   property?
19        A     I did not.
20        Q     Ms. Converse, the attorney that
21   you retained, Eric Schwartz, in January of
22   2020, was he also the attorney who
23   represented you at your examination under
24   oath?
25        A     Yes.
```

1                   S. CONVERSE
2        Q    Is Mr. Schwarts -- do you know,
3   is he based in Florida or New York or
4   somewhere else?
5        A    New York.
6        Q    Okay.  Was there a reason,
7   Ms. Converse, why you wanted to have your
8   examination under oath conducted in New
9   York as opposed to where you live in
10  Florida?
11       A    I was going up there anyways,
12  'cause my dad bought me the ticket.  So I
13  figured it'd be easier to just do it up
14  there and get it done over sooner than
15  later.
16       Q    Okay.  Did you convey that to
17  Mr. Mura, your request --
18       A    It was --
19       Q    -- conduct it in New York as
20  opposed to Florida?
21       A    It was discussed to my attorney.
22  Mura wouldn't talk to me, because I
23  retained a lawyer.
24       Q    So those conversations, to your
25  knowledge, were had between your attorney

Page 91

1                      S. CONVERSE
2    and Mr. Mura; is that correct?
3         A     Yes.
4         Q     Okay.  And that would be
5    conversations with regard to where the
6    examination under oath would be held; is
7    that correct?
8         A     Correct.
9         Q     Okay.
10        A     And then Mura changed the date
11   again.
12        Q     Do you know why the date was
13   changed?
14        A     Because he's got a property in
15   Sarasota, and maybe he wanted to stay in
16   Sarasota longer.  I don't know.
17        Q     You said, "maybe."  Do you have
18   any knowledge -- and it's okay if you
19   don't -- why that date was changed, if it
20   was changed?
21        A     I believe -- there's knowledge
22   somewhere.  I can't remember if it's in an
23   e-mail where they stated that Mura had to
24   change the date to a later date.  It's
25   somewhere that I have with my attorney --

```
 1                    S. CONVERSE
 2   my then attorney.
 3        Q    But you retained Mr. Schwartz
 4   for the purpose of assisting you with
 5   responding to the examination under oath
 6   and request for documents; is that
 7   correct?
 8        A    Please repeat that.
 9        Q    Sure.  You retained Mr. Schwartz
10   to represent you in connection with the
11   examination under oath; correct?
12        A    No, I retained Mr. Schwartz in
13   regards to the Lea County Sheriff's
14   Department --
15        Q    Oh, I see.
16        A    -- under the investigation.
17   Because when Lea County Sheriff's
18   Department came into my work office, they
19   threatened all of my coworkers, because I
20   was out at an appointment getting --
21   signing a deal and said if anybody
22   contacted me, they would all be under
23   arrest.  And then he proceeded to go into
24   my boss's office and tell my boss that
25   they have evidence, and I'm going to be
```

```
 1                    S. CONVERSE
 2   locked away for 30 years.  And then after
 3   my --
 4        Q    So you're giving this statement
 5   in response to my question, "Did you
 6   retain Mr. Schwartz in connection with
 7   your EUO?"
 8        A    No.
 9        Q    Your answer is no.  Okay.  Did
10   you retain Mr. Schwartz in connection with
11   the potential criminal investigation
12   against you?
13        A    Correct.
14        Q    Okay.  And was that criminal
15   investigation, do you know, with regard to
16   potential solicitation of arson?
17             MR. MCCARTHY:  Form, but you can
18        answer.
19        A    I -- yeah, because they showed
20   me the letter.  The Sheriff's Department
21   showed me the letter, and I was shocked.
22        Q    Do you recall telling the --
23   well, you haven't listened to the
24   statement you gave to the Lea County
25   Sheriff's Office; is that correct?
```

                          S. CONVERSE

1

2     A    I have not.

3     Q    Why not?

4     A    'Cause I don't have it.

5     Q    Do you recall when you spoke to

6  the Lea County Sheriff's Office and after

7  they allegedly showed you this letter,

8  that you told them you didn't recall

9  writing it, because you were intoxicated?

10    A    That is correct.

11    Q    Okay.  You specifically told the

12  Lea County Sheriff's Office that you were

13  intoxicated when you wrote the letter.

14    A    Correct.

15    Q    Okay.  And you didn't recall

16  sending the letter; is that correct?

17    A    I can't remember.

18    Q    Okay.  You can't remember if you

19  told the detectives that?

20    A    I can't -- yeah, I can't

21  remember if I told them that, or if I

22  actually remembered sending the letter.

23    Q    Okay.  You think you may have

24  remembered sending the letter when you

25  spoke to the detectives?

```
                                          Page 95

 1                   S. CONVERSE

 2            MR. MCCARTHY:  Is this a question

 3       about her recollection at the time she

 4       spoke with the detective or her

 5       recollection now?

 6            MR. WELCH:  I'm asking her if she

 7       recollects telling the detectives that she

 8       sent the letter.

 9            THE WITNESS:  I told them I sent the

10       letter, but -- or I told them after they

11       showed me.  I said, "Yeah, I must have

12       sent it."  I don't -- I don't recall my

13       conversation with the Lea County Sheriff's

14       Department.  You know, it's -- you come

15       back from the holidays, and you get a

16       knock at the door in the conference room

17       when you're all hyped up and excited about

18       selling a deal.  And you have two guys

19       that -- I was scared.  I didn't know what

20       to do, and they were telling me I was

21       going to lose my son.  And they were

22       threatening, so I was under a lot of

23       pressure and scared.

24  BY MR. WELCH:

25       Q    Did you tell them the truth?
```

```
                          S. CONVERSE
 1
 2       A    Of course I told them the truth,
 3   as I recalled at the time.  And they had
 4   already spoken with Joe, and they already
 5   confiscated his phone.  So ...
 6       Q    Okay.  Ms. Converse, I'd like to
 7   show you what's been marked as SC0001, and
 8   I'll represent to you it's a copy of a
 9   proposal we received, I believe, from your
10   counsel.  Although, I'm not entirely sure.
11   I think it was part of a production, and
12   it looks like it's from Independent
13   Commercial Contractors Inc. to you.  Do
14   you see this proposal?
15              (Exhibit SC0001 was marked for
16              identification.)
17       A    Correct, yes.
18       Q    Okay.  And the amount is
19   $48,000.  Do you see that?
20       A    Yes.
21       Q    Okay.  And the scope of work
22   says, "Demolition and cleanup of 442
23   Flower Avenue East, Watertown, New York."
24   Do you see that?
25       A    Yes.
```

```
 1                    S. CONVERSE
 2       Q    Okay.  Is this a proposal that
 3  you received?
 4       A    Yes.
 5       Q    Okay.  And it's my understanding
 6  that you have not retained this particular
 7  company to do this work; correct?
 8       A    Correct.
 9       Q    Okay.  Okay.  Ms. Converse, I'm
10  showing you what's been marked as SC0002,
11  and it appears to be an estimate from B&T
12  Construction & Masonry.  And it looks
13  like, under the description, it says,
14  "Demo entire structure and dispose of
15  materials at regional landfill."  And this
16  one is in the amount of $71,268.  Do you
17  see that?
18            (Exhibit SC0002 was marked for
19            identification.)
20       A    Yes.
21       Q    Is this the copy of an estimate
22  or proposal that you obtained?
23       A    Yes.
24       Q    Okay.  And it's my understanding
25  that you have not accepted this proposal;
```

```
                                    Page 98
 1                    S. CONVERSE
 2    correct?
 3         A    Correct.
 4         Q    Okay.  Aside from these two
 5    estimates for the demolition cost, have
 6    you received any other estimates for
 7    demolition?
 8         A    No.
 9         Q    Okay.  Ms. Converse, who is
10    Judge Renzi?
11         A    He's a judge in Watertown.
12         Q    Do you know him?
13         A    I do.
14         Q    Do you know him personally?
15         A    Not -- no, not really.
16         Q    Do you know him only in his
17    capacity as a judge?
18         A    Correct.
19         Q    Okay.  Do you and he text?
20         A    No.
21         Q    Okay.  Ms. Converse, showing you
22    what's been previously marked as SC0003.
23    I'll represent to you it's a copy of a
24    text message communication.  It was
25    received as a part of a subpoena response
```

1                      S. CONVERSE

2    from the Watertown Police Department.  It

3    has been provided to your counsel.  And

4    this particular document appears to be an

5    image that shows the name Stephanie

6    Converse.  It looks like the time is 12:35

7    p.m. on December 8th, and the body -- it

8    looks like it's a text message from Judge

9    Renzi.  Do you see that?

10                   (Exhibit SC0003 was marked for

11                   identification.)

12        A     Mm-hmm.

13        Q     Yes?

14        A     Yes.

15        Q     Do you recall sending an e-mail

16   or -- excuse me -- a text message from

17   Judge Renzi to Traci Rayburn on the date

18   of the fire?

19        A     Yes, I do.

20        Q     Okay.  And how did you come

21   about sending this -- well, withdrawn.

22   Did you create the name Judge Renzi and

23   send it from your contacts?

24        A     Yep.

25        Q     Yes?  Okay.  And what was the

                            S. CONVERSE

1

2    purpose of doing that?

3        A    Because Traci told me that she

4    was moving out of the house that weekend

5    -- or no, the weekend before that.  And by

6    the way, it shouldn't be -- that's a

7    mistake with -- meaning "burn them in

8    court," like I told her a million times I

9    would do.  I would take her to court and

10   get the -- her back rent anyways.  She

11   wasn't listening to me, so I wanted to,

12   like, scare her and say -- showing that I

13   talked to somebody legal up there.  And it

14   was supposed to be "burn them in court."

15       Q    Okay.  So this particular text

16   message was something that you created;

17   correct?

18       A    That is correct.

19       Q    Okay.  And the top states, "If

20   you win then they will take her taxes and

21   also it will show on her credit as a lien.

22   How much she owe you?"  And then it says,

23   "She owes me three months and $250 from

24   prior month, so over $3,000."  Those two

25   texts were texts that you drafted;

```
                                   Page 101
 1                    S. CONVERSE
 2    correct?
 3         A    Correct.
 4         Q    Okay.  This wasn't a two-sided
 5    conversation.  This was just a one
 6    conversation coming from you.
 7         A    Correct.
 8         Q    Okay.  And then the next says,
 9    "Wow and you wait this long.  Burn them
10    and we'll do what we have to."  Does --
11         A    Yeah, 'cause the text above it
12    shows that I'm saying that I'm going to go
13    after her and have it taken out of her
14    taxes and put a lien on -- and it's going
15    to show on her credit, just like I did
16    with other tenants prior to that.  And she
17    knew that the one tenant that I did the
18    same thing to, I took them to court, and I
19    sued them.  And I got the money.
20         Q    And where it says, "Burn them,"
21    was just an unfortunate use of the word
22    "burn"?
23         A    Like, we're going to burn them
24    in court.  We're going to get them.
25         Q    Okay.
```

```
 1                    S. CONVERSE
 2       A    It's following up with the top
 3  statement that you just read, stating
 4  we're going to -- I'm going to get the
 5  money out of her, and it's going to be on
 6  her credit.
 7       Q    So you wrote, "Wow and you
 8  waited this long."  Meaning, this would
 9  have been coming from Judge Renzi
10  presumably.  "Burn them and we'll do what
11  we have to."  Like he's saying to you to
12  burn them, and we'll do what we have to
13  do.  Is that what --
14       A    In court.
15       Q    He's saying to burn them in
16  court?  That was you're --
17       A    Yeah, we're going to burn them
18  in court.  That's -- we've always talked
19  about that.  That's how I referenced,
20  "Don't worry.  I'll burn you in court.
21  I'll get my money either way."
22       Q    Okay.  Ms. Converse, it's my
23  understanding -- and I think you've
24  already testified -- that the fire here
25  was on December 8, 2019; correct?
```

```
                                          Page 103
  1                     S. CONVERSE
  2        A     Yes.
  3        Q     Okay.  Did you come up to New
  4   York between the day of the fire and your
  5   mother's birthday?
  6        A     I can't remember when I went up
  7   there in February.  I can't give you the
  8   exact date.
  9        Q     Okay.  I'm sorry.  Poorly worded
 10   question.  The first time that you were in
 11   New York after the fire was that trip you
 12   took for your mother's birthday; correct?
 13        A     That is correct.
 14        Q     Okay.
 15             THE WITNESS:  May we have a break?
 16             MR. WELCH:  Absolutely.  You want to
 17        take another ten minutes?
 18             THE WITNESS:  Yeah, please.
 19             MR. MCCARTHY:  Yeah, ten minutes
 20        should be good.  Thanks.
 21             MR. WELCH:  Okay.
 22             THE WITNESS:  Thank you.
 23             THE REPORTER:  Okay.  We are off the
 24        record at 12:14.
 25             (Off the record.)
```

Page 104

S. CONVERSE

1
2          THE REPORTER:  We're back on the
3      record at 12:26 p.m.
4          MR. WELCH:  Just give me a second.
5      I'm trying to mark something here.
6  BY MR. WELCH:
7      Q    Okay.  Ms. Converse, I'd like to
8  show you what's been marked as SC0004.  I
9  just want you to be able to identify this.
10  So these are copies of, I believe,
11  photographs of some text exchanges or
12  copies of text exchanges between you and
13  Traci.  I'm assuming it's Traci Rayburn.
14  These were provided to us by your counsel
15  in connection with discovery.  I just want
16  you to identify for the record.  Is SC0004
17  -- it's a 22-page document, but I'll just,
18  kind of, scroll through it quickly.  And
19  you can tell me if these are copies of
20  your text messages with Traci.
21              (Exhibit SC0004 was marked for
22              identification.)
23      A    Yes.
24      Q    Okay.  Okay.  That was it.  And,
25  Ms. Converse, showing you what's been

```
1                    S. CONVERSE
2    marked as SC0005.  I'll represent to you
3    it's a copy of 2020 tax returns provided
4    to us by your counsel in connection with
5    discovery responses.  Just taking a look
6    at the first page, Ms. Converse, it's 1 of
7    15.  Is this, in fact, a copy of your 2020
8    tax return?
9              (Exhibit SC0005 was marked for
10             identification.)
11       A    If that's what my attorney gave
12   you, then yes.
13       Q    Okay.  Did you file this?  Do
14   you recall if it was filed?
15       A    I did not file -- file it, but I
16   have an accountant that I've used.
17       Q    Okay.  So it's been filed.
18       A    Correct.
19       Q    Okay.  And just taking a look,
20   if you will, I'll show you here under the
21   line number eight, it says, "Other income
22   from schedule one, line nine," and it has
23   a negative $125,570.  Do you see that?
24       A    Yeah.
25       Q    Okay.  Do you know what that
```

Page 106

```
 1                    S. CONVERSE
 2   refers to?
 3        A    I do not know.
 4        Q    Okay.  And jumping down to page
 5   3 of 15, on the upper left-hand corner it
 6   says, "schedule one."  Do you see that?
 7        A    I do.
 8        Q    And under line eight, it says,
 9   "Other income.  List type and amount."  It
10   says, "HSA."  No, excuse me.  Under line
11   four, it says, "Other gains or losses.
12   Attach form 4797."  And it says the same
13   amount, 125,000.  Oh, it actually has a
14   little bit different amount.  This amount
15   says negative $125,082.  Do you see that?
16        A    I do.
17        Q    Okay.  Then below that, there's
18   also an amount for rental real estate
19   royalties, and that's also a negative
20   amount of negative 3,572.  Do you see
21   that?
22        A    I do.
23        Q    Okay.  And then under line nine,
24   it says negative $125,570.  Do you see
25   that?
```

Page 107

S. CONVERSE

1

2       A    I do.

3       Q    Okay.  Do you have any

4   understanding of what any of those numbers

5   refer to?

6       A    I don't.

7       Q    Okay.  Do you know if you took

8   the damage to 442 Flower Avenue as a loss

9   on your 2020 income taxes?

10      A    I reached out to my accountant,

11  and I asked him if that's something --

12  because I wasn't getting any responses

13  from State Farm.  So I had asked him, "Is

14  that something I can write off as --

15  because I wasn't getting the rental

16  income?"  And he said, yes, I could.

17      Q    Okay.  Write off the value of

18  the property or the income?  Both?

19  Something else?

20      A    I can't remember.

21      Q    Okay.  So jumping down to page

22  11 of 15, it says, "Form 4797."  Do you

23  see that on the upper left-hand side?

24      A    I do.

25      Q    Okay.  And then taking a look,

Page 108

```
 1                    S. CONVERSE
 2   if you would, at page 13 of -- I'm sorry
 3   -- 14 of 15, upper left-hand side, it
 4   says, "Section B, business and
 5   income-producing property.  Part one,
 6   casualty or theft gain or loss."  Do you
 7   see that?
 8        A    Yes.
 9        Q    Property A indicates, "Rental
10   property, Watertown, New York."  And if
11   you take a look at line 38, it looks like,
12   combine these lines and enter the net gain
13   or loss here.  And it looks like it's the
14   negative $125,082.  Do you see that?
15        A    I do.
16        Q    Does this appear to indicate to
17   you that your account had included a
18   casualty loss on your 2020 personal income
19   tax returns for this property?
20        A    I can't answer that, because I
21   didn't do it or file it.  We had
22   discussions about it, discussions as if I
23   could write it off, but I don't know what
24   he did.
25        Q    Did you authorize him or give
```

Page 109

                      S. CONVERSE

1

2    him your consent to file your 2020 taxes?

3        A    I did.

4        Q    Did you review the forms prior

5    to them being filed?

6        A    I did not.  I never do.

7        Q    Okay.  So you -- just as you sit

8    here today, you don't know whether or not

9    there was a loss taken on your 2020 taxes

10   for the value of the property?

11       A    As I mentioned, we had the

12   conversation.  I did not see anything

13   before it was filed, so I cannot answer

14   that question to -- however you want me

15   to.

16       Q    I just want to know if you knew

17   it or not, whether or not it was a part of

18   your --

19       A    Like I said, we -- we had the

20   conversation.

21       Q    Okay.  Well, you had the

22   conversation, but that doesn't answer the

23   question of whether or not you knew if it

24   was done or not.  And you've answered,

25   "no"; correct?  You don't know whether or

```
                                      Page 110
 1                    S. CONVERSE
 2   not it was done.
 3        A    I don't know.
 4        Q    All right.  Ms. Converse,
 5   showing you -- just going back to Exhibit
 6   SC0003.  The time, it looks like it's
 7   indicated here.  It says, "Stephanie
 8   Converse, 12:35 p.m., December 8th."  Do
 9   you see that?
10        A    Yes.
11        Q    Okay.  Seeing the time on this
12   particular text that you sent to Traci,
13   would this indicate to you that the fire
14   happened after 12:35 p.m.?
15             MR. MCCARTHY:  Form.
16        A    That it happened after 12:35
17   p.m.
18        Q    Yes.
19        A    Well, you just showed me the
20   fire report that stated it was, like,
21   around, what, 12-something p.m.?  So I
22   would --
23        Q    Sometime after --
24        A    So yeah, I was fighting with
25   Traci -- if -- you went through the text
```

Page 111

1                     S. CONVERSE

2   messages; correct?  So you saw in there

3   where she was supposed to be out, and we

4   were arguing that morning.  And I was at

5   brunch.  So this was my way of trying to

6   scare her out, because she knew that I've

7   taken other tenants and had them evicted

8   through the City constable.  And I got

9   their wages -- I would take -- get people

10  to get money from their wages, and it

11  would be on their credit.  So I was trying

12  to scare her, and she lied to me and told

13  me she was admitted into the hospital.

14       Q    Okay.  But at least looking at

15  the time on this text, it looks like as

16  though it was sent prior to the fire;

17  correct?  Do you agree with that?

18       A    Looks like it -- yes, it looks

19  like it's been sent prior to the fire.

20  But if you look at the text after, you see

21  where I start blaming her for causing the

22  fire.

23       Q    Right.

24       A    Yeah, but, you know, that's not

25  brought up.

```
                                        Page 112
 1                    S. CONVERSE
 2        Q     Well, I understand that you were
 3   looking to blame her for setting the fire,
 4   but did you similarly send a text message
 5   to Joey Pelton about his involvement?
 6        A     I don't recall.
 7        Q     Okay.  When the police -- well,
 8   withdrawn.  Did the police -- did you give
 9   Traci Rayburn's name to the police or fire
10   department that were investigating the
11   fire loss?
12        A     I did.
13        Q     Okay.  And that's because you
14   had indicated to them that you had been
15   arguing, and you wanted to give them that
16   information?
17        A     Yes.
18        Q     Okay.  And was there a reason
19   why you didn't give Joey Pelton's name to
20   the police or fire department on the day
21   of the fire?
22        A     I wasn't even thinking about Joe
23   Pelton at all that day.
24        Q     Let's see.  I'm just going to
25   mute myself for a moment.  Ms. Converse,
```

```
 1                    S. CONVERSE
 2    I'm going to play for you a portion of a
 3    recorded conversation that we obtained
 4    from the Lea County Sheriff's Office
 5    pursuant to a subpoena.  This recording
 6    has been provided to your counsel in
 7    various discovery exchanges.  I'm going to
 8    play a portion for you and ask you some
 9    questions.  Okay?
10         A    Yes.
11              (Audio played.)
12         Q    Ms. Converse, that portion of
13    the recording I played for you, do you
14    recognize the voice on the recording?
15         A    Yes.
16         Q    Okay.  Is that your voice on
17    that recording?
18         A    Yes.
19         Q    Okay.  And do you recall that
20    interview being conducted on January 2,
21    2020?
22         A    Yes.
23         Q    Okay.  And at the time, were you
24    aware that you were being recorded?
25         A    Yes.
```

```
                          S. CONVERSE
 1
 2        Q    Did you give your consent to
 3   being recorded?
 4        A    Yes.
 5        Q    And that recording was taken at
 6   your place of business; is that correct?
 7        A    Yes.
 8        Q    Okay.  And I'm going to play for
 9   you a portion of the recording that starts
10   at approximately -- it's a 19 minute and
11   33 second recording.  I'm going to play
12   you a portion that begins around minute
13   3:02.  So I'm going to go back to about 2
14   minutes and -- it looks like -- 50 seconds
15   roughly.
16              (Audio played.)
17              Ms. Converse, do you recall
18   being asked those questions by the
19   detective with regard to the letter that
20   you had sent to Mr. Pelton?
21        A    I don't know what I was
22   referring to.
23        Q    What do you mean?
24        A    What was the question?
25        Q    Sure.  Do you recall providing
```

Page 115

```
 1                    S. CONVERSE
 2   this statement to the detective with
 3   regard to reaching out to Mr. Pelton and
 4   asking him to burn your house?
 5           MR. MCCARTHY:  Form.  You can answer
 6       if you understand.
 7       A    I don't understand.
 8       Q    Okay.  Do you acknowledge that
 9   you made this statement to the detectives?
10       A    That -- it's my voice.
11       Q    Okay.  And you have not heard
12   this recording before; is that correct?
13       A    I have not.
14           MR. WELCH:  Okay.  Just give me five
15       minutes.  I'll just go through my notes
16       and see if I have anything else.  Taking a
17       quick break.
18           MR. MCCARTHY:  Okay.  Off the record.
19           (Off the record.)
20           THE REPORTER:  Back on the record at
21       12:51.
22           MR. WELCH:  Okay.  Ms. Converse, at
23       this time, I have no further questions for
24       you.  Thank you very much for your time
25       today.
```

Page 116

1                    S. CONVERSE

2          THE WITNESS:  All right.  Thank you.

3          THE REPORTER:  Okay.  Mr. Welch,

4     you're ordering the original transcript;

5     correct?

6          MR. WELCH:  Yes, please.

7          THE REPORTER:  Okay.  We are off the

8     record at 12:51 p.m.

9

10         (Whereupon, at 12:51 p.m., the

11         proceeding was concluded.)

12

13

14     _____

           Stephanie Converse

15

16     Subscribed and sworn to

17     before me this _____ day

18     of _____, 20____.

19

       _____

20     Notary Public

21

22

23

24

25

Page 117

1                CERTIFICATE OF DEPOSITION OFFICER

2          I, JENNIFER ESTEVEZ, the officer before whom the

3    foregoing proceedings were taken, do hereby certify that

4    any witness(es) in the foregoing proceedings, prior to

5    testifying, were duly sworn; that the proceedings were

6    recorded by me and thereafter reduced to typewriting by a

7    qualified transcriptionist; that said digital audio

8    recording of said proceedings are a true and accurate

9    record to the best of my knowledge, skills, and ability;

10   that I am neither counsel for, related to, nor employed by

11   any of the parties to the action in which this was taken;

12   and, further, that I am not a relative or employee of any

13   counsel or attorney employed by the parties hereto, nor

14   financially or otherwise interested in the outcome of this

15   action.

16

17                                  JENNIFER ESTEVEZ

18                            Notary Public in and for the

19                                  State of New York

20

21

22

23

24

25

Page 118

1              CERTIFICATE OF TRANSCRIBER

2          I, RACHEL ROBERTS, do hereby certify that this

3     transcript was prepared from the digital audio recording of

4     the foregoing proceeding, that said transcript is a true

5     and accurate record of the proceedings to the best of my

6     knowledge, skills, and ability; that I am neither counsel

7     for, related to, nor employed by any of the parties to the

8     action in which this was taken; and, further, that I am not

9     a relative or employee of any counsel or attorney employed

10    by the parties hereto, nor financially or otherwise

11    interested in the outcome of this action.

12

13

14                                   RACHEL ROBERTS

15

16

17

18

19

20

21

22

23

24

25

Page 119

**ERRATA SHEET**

**VERITEXT/NEW YORK REPORTING, LLC**

CASE NAME: Converse, et al. v. State Farm Fire & Casuality Company
DATE OF DEPOSITION: 7/26/2022
WITNESSES' NAME: Stephanie Converse

PAGE    LINE (S)        CHANGE              REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                                   _____
                                   Stephanie Converse
SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____          _____
(NOTARY PUBLIC)                    MY COMMISSION EXPIRES:

**[& - 850]** Page 1

**&**

**&**   5:10 6:11 7:17
44:25 75:8
97:12 119:2

**1**

**1**   4:3 66:17
105:6
**1,000**   23:17,18
**10/30/20**   3:21
**104**   3:11
**105**   3:12
**10:02**   1:15 5:6
**11**   46:21 51:13
51:16,23 107:22
**11556-3823**   2:15
**11:11**   61:25
**11:22**   62:4
**12**   110:21
**125,000**   106:13
**125,082**   106:15
108:14
**125,570**   105:23
106:24
**12:14**   103:24
**12:26**   104:3
**12:48**   66:19
**12:51**   115:21
116:8,10
**13**   67:10 68:6
69:18 70:10
108:2
**13202**   2:7
**13601**   46:3
**13th**   68:13
**14**   108:3
**15**   105:7 106:5
107:22 108:3

**150,000**   53:25
54:8
**1755**   9:23
**17557**   1:17 5:11
10:6
**18**   49:22
**19**   53:25 114:10
**19,250**   55:8

**2**

**2**   4:6 72:15,18
113:20 114:13
**2/21/21**   3:18
**20**   51:9 116:18
119:22
**2012**   19:9,15
21:3,22 22:5
24:6
**2017**   59:7 87:16
87:19
**2018**   59:4
**2019**   4:14 18:18
18:21 19:4
22:17,24 24:7,9
25:7 26:22
27:23 32:11
46:11 48:24
51:13,16,23
53:25 58:22,25
66:13 75:17,21
78:24 86:12
88:20 102:25
**2020**   3:12 4:12
10:23 18:5
52:24 67:10
68:6,13 69:18
70:10 72:15,18
77:13,21 89:22

**105:3,7 107:9**
108:18 109:2,9
113:21
**2021**   62:16 64:6
**2022**   1:14 5:11
**203**   2:6
**20th**   76:8
**21**   62:16 64:6
**22**   52:7 104:17
**247**   2:6
**250**   100:23
**26**   1:14 5:10
**26713**   118:13
**28488**   117:16
**2nd**   52:22,23

**3**

**3**   4:8 106:5
**3,000**   100:24
**3,572**   106:20
**30**   53:18 93:2
**31**   4:5 46:10
55:3
**32**   56:2 58:4
59:15
**33**   4:7 114:11
**33967**   1:18 5:12
**38**   108:11
**39**   18:17
**3910**   10:25 18:11
**3:02**   114:13

**4**

**4**   4:10
**442**   4:5,7 12:17
18:22 19:7
31:21 37:16
40:5 46:2,13
58:19 64:10

**66:8 75:8 96:22**
107:8
**444**   75:8
**45**   3:17
**4797**   106:12
107:22
**48,000**   96:19

**5**

**5**   4:13 88:20
**5,000**   22:15,24
23:8,12,19 25:9
74:24 78:18
**50**   114:14
**516-357-3443**
2:17
**5341772**   1:20
**5:21cv457**   1:8

**6**

**6/5/19**   3:22
**61**   4:9
**62**   3:18
**66**   3:21

**7**

**7**   3:3
**7/26/2022**   119:3
**71,268**   97:16
**73**   3:19
**77**   4:12

**8**

**8**   18:18,21 19:4
26:22 27:23
32:11 66:13
75:17 78:23
102:25
**850**   55:7,20

| | | | |
|---|---|---|---|
| **86** 4:14 | **acknowledge** | **allegation** 45:22 | **apartments** |
| **88** 3:22 | 83:2,7 115:8 | 46:3,14,25 47:17 | 43:21 55:5 56:7 |
| **8th** 24:7 99:7 | **acknowledgm...** | 50:11,15 52:14 | 56:16 59:16,22 |
| 110:8 | 5:14 | **allegedly** 94:7 | **appear** 108:16 |
| **9** | **action** 47:8,13 | **alter** 69:17 | **appearance** 11:8 |
| **900** 55:7,10 | 117:11,15 118:8 | **altered** 69:4 | **appears** 88:19 |
| **926** 2:14 | 118:11 | 70:11 | 97:11 99:4 |
| **96** 3:8 | **addiction** 82:8 | **america** 35:25 | **appliances** 40:21 |
| **97** 3:9 | **additionally** | **amount** 23:16 | 41:22 42:6 |
| **99** 3:10 | 5:17 56:3 | 38:15 56:4 | 43:20 56:6 |
| **9th** 2:14 | **address** 9:22,24 | 96:18 97:16 | 59:16 |
| **a** | 10:22 11:2 | 106:9,13,14,14 | **applicable** 5:24 |
| **a.m.** 1:15 5:6 | **administer** 5:14 | 106:18,20 | **application** 20:5 |
| 62:4 | **admitted** 111:13 | **annually** 55:9 | **appointment** |
| **ability** 9:19 | **advised** 37:22 | **answer** 8:2 9:4,5 | 92:20 |
| 117:9 118:6 | **affect** 9:19 | 9:13 14:23 | **approximately** |
| **able** 47:10 70:17 | **afterward** 85:9 | 16:23 20:23 | 114:10 |
| 104:9 | **agent** 51:17 | 21:18,23 22:14 | **arguing** 111:4 |
| **absent** 5:17 | **ago** 12:4 14:24 | 24:18 47:4 | 112:15 |
| **absolutely** | 29:22 79:8 | 54:11,12,13 63:7 | **ariana** 33:6 |
| 103:16 | **agree** 5:15,20 | 69:6 70:14 | **arrest** 92:23 |
| **acceptable** 9:11 | 6:12,15,18 74:16 | 71:22 80:4 | **arrived** 54:8 |
| **accepted** 97:25 | 78:12 111:17 | 82:24 83:16 | **arson** 93:16 |
| **access** 47:10 | **agreed** 38:11 | 84:21 89:12 | **aside** 13:7,22 |
| 75:3 | 64:14 | 93:9,18 108:20 | 39:15 43:18 |
| **account** 34:23 | **agreement** 3:22 | 109:13,22 115:5 | 98:4 |
| 35:2,4,8,13,13 | 21:10 25:7 33:9 | **answered** 84:18 | **asked** 9:12 15:15 |
| 35:16,20,24 36:4 | 33:13,22 39:16 | 109:24 | 17:15 50:6 |
| 36:5,7,16,23,24 | 43:16 60:11 | **answering** 8:22 | 54:19 89:10,15 |
| 37:3,4,7 49:16 | **agreements** 4:6 | **anybody** 27:3 | 107:11,13 |
| 63:2,5,19 108:17 | 33:17 38:23,25 | 29:7,10 92:21 | 114:18 |
| **accountant** | **ahead** 10:5 | **anyways** 90:11 | **asking** 7:21 8:7 |
| 105:16 107:10 | 23:23 81:5 | 100:10 | 8:21 14:7 16:16 |
| **accounts** 49:15 | 84:21 | **apart** 15:23 | 16:19 71:12 |
| **accurate** 47:18 | **airline** 77:10 | **apartment** 10:12 | 80:3,9,10 81:24 |
| 117:8 118:5 | **al** 119:2 | 40:15,16 42:3 | 82:22 83:4 |
| | **alarm** 66:18 | 46:23 56:8 | 84:17 95:6 |
| | | 59:18,24 60:3 | 115:4 |

**assigned** 5:4
88:15
**assist** 51:14
**assisted** 52:11
53:6
**assisting** 92:4
**assuming** 75:21
78:10 104:13
**assumption** 8:4
**attach** 106:12
**attached** 3:13,23
50:10 61:3
**attendance** 6:7
**attorney** 6:13
7:16 13:2 14:2
15:20 17:8
52:17 60:24
89:20,22 90:21
90:25 91:25
92:2 105:11
117:13 118:9
**audio** 113:11
114:16 117:7
118:3
**authorize** 108:25
**authorized** 5:13
**avenue** 4:5,7
12:17 18:22
19:7 31:21
37:17 40:5 46:2
46:13 58:19
64:10 66:9 75:9
96:23 107:8
**aware** 15:3
17:25 25:21
30:22 50:22,24
113:24

**b**

**b** 3:5,15 50:10
108:4
**b&t** 97:11
**back** 18:4 21:6
24:23,24 62:3
67:4 69:22
74:25 81:8
86:12 87:17
95:15 100:10
104:2 110:5
114:13 115:20
**bank** 25:18,22
26:2,10 35:14,20
35:25 53:12,13
**based** 56:11
59:19 74:8 84:5
85:5 90:3
**basement** 32:16
42:21 43:3,19
56:17,19,25 57:9
57:12 58:12
59:12 60:2 75:2
**basically** 85:4
**basis** 14:18
**bc** 68:7
**began** 51:12
**begins** 114:12
**behalf** 2:2,10
26:23
**belief** 53:23
**believe** 22:15,23
24:20 27:13
31:9 33:11
38:17 58:9 61:4
70:6,18 75:8
82:14,16 89:2
91:21 96:9

104:10
**belongings** 57:9
**beneficiary** 35:6
35:7,9
**best** 117:9 118:5
**bigger** 44:22
**bills** 47:7
**birthday** 71:7
73:22,25 74:12
74:16 76:7
77:23 87:10
103:5,12
**bit** 44:22 81:7,15
106:14
**blame** 112:3
**blaming** 111:21
**blank** 89:7
**blaze** 49:23
**board** 27:6
**boarded** 27:11
27:17 28:2
**body** 99:7
**book** 48:20
**bookcase** 58:9
59:11
**borrow** 35:23
**borrowed** 24:20
25:6
**borrower** 19:24
**boss** 92:24
**boss's** 92:24
**bottom** 88:18
**bought** 76:22,23
90:12
**boyfriend** 43:14
**boyfriend's**
57:23

**break** 9:10,14
61:16 103:15
115:17
**brickstone** 1:17
5:11 10:6,7,21
**bring** 48:2 49:5
**bringing** 62:7
**brings** 67:19
68:3 70:25
**broker** 38:19,23
39:17
**brokers** 39:2
**brookstone** 9:23
**brought** 7:19
111:25
**brunch** 67:4
80:22,23 81:9
111:5
**bt** 3:9
**building** 30:15
42:18
**burn** 100:7,14
101:9,20,22,23
102:10,12,15,17
102:20 115:4
**burnt** 64:23
**business** 34:25
35:4,8,13 36:4
47:21 48:19,21
49:16 63:2,5,19
108:4 114:6
**buy** 87:4

**c**

**c** 2:1
**call** 13:15 31:17
33:16 61:5 77:7
80:10 85:8,13,19

| | | | |
|---|---|---|---|
| **called** 7:4 13:13 80:12 85:12 | 91:10,13,19,20 | 98:24 | **consider** 34:3 |
| **calling** 83:11 | **changes** 68:23 | **communications** 4:10 15:24 77:9 | **constable** 111:8 |
| **calls** 16:11 79:19 | **check** 23:5 | **company** 1:9 | **constitute** 6:4 |
| **capacity** 98:17 | **checking** 36:23 | 2:11 5:10 6:11 | **construction** 3:9 97:12 |
| **card** 71:7 73:23 73:25 74:12 86:21,21,23 | **child** 43:16 | 7:18 44:25 | **contacted** 69:3,8 92:22 |
| **care** 47:21 | **cigarette** 50:2 67:15 | 47:20 48:13 63:21,24 64:3,8 | **contacts** 99:23 |
| **carpet** 28:9 | **city** 111:8 | 64:9,15 97:7 119:2 | **contained** 52:12 53:7 |
| **case** 1:7 9:20 15:8,23 44:23 | **claim** 51:11,15 51:18 56:23 58:6 61:8 | **complaint** 3:17 44:21 45:9,12 | **contents** 4:9 61:7 79:14 |
| 119:2 | **claiming** 60:22 | 48:23,25 62:7,9 62:10 68:20 | **contract** 21:10 88:8,15 89:11 |
| **cash** 23:6 74:24 | **claims** 4:9 | **complaints** 48:2 | **contractor** 28:23 28:24 |
| **casuality** 119:2 | **cleanup** 3:7 96:22 | 48:6 | **contractors** 4:4 29:15,17,18 |
| **casualty** 1:8 2:10 5:10 6:11 7:17 44:25 108:6,18 | **client** 15:20 | **complex** 46:23 | 31:20 96:13 |
| **cause** 49:25 50:4 56:21 64:23 | **close** 65:16 | **concluded** 116:11 | **contribute** 22:8 22:12 |
| 67:3,11 76:11 77:23 90:12 | **closing** 20:20 | **condition** 9:11 26:19 28:5 | **contributed** 20:15,19 24:8 |
| 94:4 101:11 | **coincidence** 68:18 | **conduct** 90:19 | **contributing** 50:7 |
| **causing** 111:21 | **collect** 47:6 | **conducted** 90:8 113:20 | **control** 36:17 |
| **cell** 4:13 22:21 85:24 86:8,11 | **combine** 108:12 | **conference** 95:16 | **controlled** 34:24 35:17 36:24 |
| **certain** 37:13 | **come** 43:21 75:5 75:23,25 76:19 | **confirm** 50:4 | 37:8 |
| **certificate** 117:1 118:1 | 77:20 78:2,9 81:14 87:2,6,25 | **confirmation** 4:11 77:4,11 | **conversation** 16:8,21 17:7,10 |
| **certified** 5:20 | 95:14 99:20 103:3 | **confirmed** 67:17 | 17:13 18:3 25:5 38:8 80:8 85:16 |
| **certify** 117:3 118:2 | **coming** 67:4 77:22 81:8 87:3 | **confiscated** 96:5 | 95:13 101:5,6 109:12,20,22 |
| **chairs** 58:8 59:10 | 101:6 102:9 | **connection** 7:18 11:7 56:24 | 113:3 |
| **change** 51:6 91:24 119:5 | **commercial** 96:13 | 60:20 61:9 92:10 93:6,10 | **conversations** 16:6 17:23 |
| **changed** 31:14 67:12 68:19 | **commission** 119:25 | 104:15 105:4 | |
| | **common** 16:3,12 | **consent** 109:2 | |
| | **communication** 15:21 70:18 | 114:2 | |

37:20 50:18
78:24 79:5 80:2
84:6 85:6 90:24
91:5
**converse** 1:4,5
1:13 2:2,3 5:1,8
5:9,9 6:1,14,17
6:17 7:1,3,13,20
8:1 9:1,2,17
10:1 11:1,7 12:1
13:1,23 14:1
15:1,2,4,8,12,15
16:1,5 17:1,4,6
17:12,21 18:1,2
18:10 19:1,6,19
20:1,10,15,19
21:1 22:1,19
23:1 24:1,7,16
25:1,11,20 26:1
26:17 27:1 28:1
29:1 30:1 31:1
32:1,2,6,11 33:1
34:1,7,18 35:1
36:1,19 37:1,10
38:1,22 39:1,5
39:21 40:1,10
41:1 42:1 43:1
44:1,14,17,24
45:1,24,25 46:1
47:1,14 48:1
49:1 50:1,11
51:1,19 52:1,8
52:10,14 53:1,11
54:1,5,14 55:1
56:1,10 57:1,15
58:1 59:1,20
60:1 61:1 62:1
62:12,16,17,17

63:1,11,20 64:1
64:10,15,20 65:1
65:7,11,17,19
66:1 67:1,20
68:1 69:1 70:1
71:1 72:1,16
73:1,2,4,19 74:1
74:4,8,19 75:1
76:1 77:1,9 78:1
78:21 79:1,16
80:1 81:1,19
82:1,13 83:1,18
84:1 85:1,23
86:1,7,10,18
87:1 88:1,4,18
89:1,20 90:1,7
91:1 92:1 93:1
94:1 95:1 96:1,6
97:1,9 98:1,9,21
99:1,6 100:1
101:1 102:1,22
103:1 104:1,7,25
105:1,6 106:1
107:1 108:1
109:1 110:1,4,8
111:1 112:1,25
113:1,12 114:1
114:17 115:1,22
116:1,14 119:2,3
119:21
**converse's** 17:18
61:7 88:6
**convey** 90:16
**cooperating**
51:12
**cooperation**
51:16

**copies** 29:19
104:10,12,19
**copy** 44:21 50:9
51:2,8 54:19,22
66:7 72:8 73:5
74:11 88:7,14
96:8 97:21
98:23 105:3,7
**corner** 106:5
**correct** 10:8
11:16 18:23
24:10,13 25:9,10
25:12,14 26:2,7
26:8,19 27:14
30:4,5 31:11,12
34:7,10,24 36:12
36:13,17,20 37:3
37:8,9,13 42:7,8
42:15,16 43:4,8
43:12,13 46:5,19
48:3,13 51:23,24
53:9 55:2,18
56:14 58:22
59:22 64:7,11,12
72:13 74:10
77:17 78:19
82:23 83:5,13,17
83:21 91:2,7,8
92:7,11 93:13,25
94:10,14,16
96:17 97:7,8
98:2,3,18 100:17
100:18 101:2,3,7
102:25 103:12
103:13 105:18
109:25 111:2,17
114:6 115:12
116:5

**correctly** 9:25
**correspondence**
4:3 31:19
**cost** 98:5
**costs** 20:20
**counsel** 6:9,10
14:21 16:7,18
50:19 52:10
96:10 99:3
104:14 105:4
113:6 117:10,13
118:6,9
**counseling** 82:7
**count** 32:17
**county** 1:2 18:4
53:4 72:6,17
79:18 92:13,17
93:24 94:6,12
95:13 113:4
**course** 61:17
96:2
**court** 1:1 54:4
100:8,9,14
101:18,24
102:14,16,18,20
**courtesy** 8:20,22
**coworkers** 67:5
80:22 92:19
**craigslist** 39:11
39:12
**create** 99:22
**created** 100:16
**credit** 35:15
86:21,23 100:21
101:15 102:6
111:11
**criminal** 93:11
93:14

**cross** 81:18
**crying** 80:12
**currently** 4:14
  26:17
**cut** 75:7

**d**

**d** 3:1,15 4:1
**dad** 90:12
**damage** 26:24
  27:4,5,19 56:24
  107:8
**damaged** 26:18
  44:10 57:4,12,17
  58:5,11
**damages** 13:9
  54:3
**date** 1:14 19:2,2
  19:3 22:5 26:21
  31:22 34:16
  37:21 39:4,18,22
  53:2 55:23,24
  57:14 66:12,17
  68:6 87:16
  88:20 91:10,12
  91:19,24,24
  99:17 103:8
  119:3
**dated** 78:23
**day** 75:4 80:18
  80:20,25 81:2
  82:13 103:4
  112:20,23
  116:17 119:22
**deal** 92:21 95:18
**debit** 86:21,23
**december** 18:18
  18:21 19:4 24:7

26:22 27:23
32:11 51:13,16
51:23 53:25
66:13 99:7
102:25 110:8
**deed** 3:18 62:14
  63:10
**defendant** 51:12
**defendant's** 6:8
  51:14,17
**defendants** 1:10
  2:10 46:12
  51:13
**define** 36:18
  39:10
**demo** 97:14
**demolish** 30:14
  30:21,24 31:11
  32:4
**demolition** 3:7
  30:8 31:2 96:22
  98:5,7
**demonstrated**
  49:25
**department**
  49:24 50:23
  69:10 92:14,18
  93:20 95:14
  99:2 112:10,20
**deponent** 6:14
**deposed** 15:4,8
  17:8
**deposit** 32:3
**deposited** 37:7
**deposition** 1:12
  5:7 6:2 11:9
  13:11 14:22
  15:2,9,12,16

16:9 17:15,18,19
17:22 37:12
44:16 65:19
73:4,11,18 74:5
88:6 117:1
119:3
**description** 3:6
  3:16 4:2 97:13
**despite** 81:23
  82:21
**detective** 95:4
  114:19 115:2
**detectives** 79:17
  94:19,25 95:7
  115:9
**determined** 54:3
**difference** 14:12
**different** 106:14
**digital** 117:7
  118:3
**directed** 30:20
  30:23
**direction** 49:20
**directly** 47:7
  69:8
**discovery**
  104:15 105:5
  113:7
**discuss** 15:14
  17:14 38:14,18
  49:6 73:10
**discussed** 14:10
  16:17,17 37:22
  37:25 38:20
  59:17 90:21
**discussions**
  108:22,22

**dispose** 97:14
**doctrine** 16:3,13
**document** 13:17
  13:22 45:4,21
  62:18 65:17,20
  66:3 67:22 88:8
  89:3 99:4
  104:17
**documentation**
  71:25
**documents** 11:9
  70:15 92:6
**doing** 15:9 74:22
  100:2
**door** 74:25 95:16
**downstairs**
  55:11 82:18
**drafted** 100:25
**drawn** 36:15
**drive** 76:20
**dryer** 41:3 42:13
  42:18,21 43:3,8
  43:19 59:23
  60:3,5,13,15
**dryers** 56:7
  57:20,25 59:18
  59:21,25
**duly** 7:5 117:5

**e**

**e** 2:1,1 3:1,5,10
  3:15,15,15 4:1,1
  4:1 58:17 66:17
  69:23 70:4,7,17
  77:8 91:23
  99:15
**earlier** 37:11
  59:19 80:22

easier 90:13
east 4:5,7 12:18
 18:22 31:21
 46:2,14 75:9
 96:23
eight 65:20 67:8
 105:21 106:8
eighth 66:2
either 34:22
 36:23 43:21
 44:9 102:21
electrical 75:5
electricity 23:25
electronic 23:6,7
electronically
 35:23
employed 48:15
 117:10,13 118:7
 118:9
employee 117:12
 118:9
ended 82:6
enter 108:12
entire 97:14
entirely 96:10
entirety 11:19
entitled 14:16
 53:20
equity 38:6
eric 52:19 89:21
errata 119:1
es 117:4
escrowed 32:9
 46:18
especially 8:16
esquire 2:4,12
estate 106:18

estevez 1:19 5:3
 117:2,17
estimate 3:9
 97:11,21
estimates 4:3
 29:20,24 30:3,7
 30:14,25 31:18
 98:5,6
et 119:2
euo 11:12,15,16
 13:7 76:12 93:7
everybody 8:17
 81:17
evicted 111:7
evidence 67:18
 68:3 69:16 70:4
 70:7,25 92:25
evidentiary 5:25
ex 42:22,25
 57:23
exact 45:7 54:2
 70:14 103:8
exactly 28:10
 56:21 57:3,13,22
 70:13
examination 3:2
 7:11 19:11 52:9
 89:23 90:8 91:6
 92:5,11
examined 7:7
excel 13:4
exchanges
 104:11,12 113:7
excited 95:17
exclusive 88:7
 89:10
excuse 62:9 67:7
 75:16 99:16

106:10
exhibit 3:7,9,10
 3:11,12,17,18,19
 3:20,22 45:5
 50:10 62:19
 66:4 73:4,7 88:9
 96:15 97:18
 99:10 104:21
 105:9 110:5
exhibits 3:13,23
 44:15
expires 119:25
express 74:4
extent 15:20
 33:18 86:14
extinguishing
 49:23

**f**

f 4:1
fact 81:23 82:21
 105:7
factors 50:6
fair 27:19 53:20
 53:23 54:7
familiar 50:13
family 11:6
far 42:12
farm 1:8 2:10
 5:10 6:10 7:17
 7:20 11:14
 12:24 13:18
 25:22,25 44:24
 53:12,15 54:16
 54:19 68:21
 69:3,16 70:8,19
 107:13 119:2

farm's 27:9
father 30:12,25
 76:22,25 77:10
 86:20 87:4
fayette 2:6
february 4:12
 10:23 62:15
 64:6 76:6,8,10
 76:18 77:13,21
 87:11 103:7
federal 35:15
 40:6
felt 85:8
fighting 110:24
figured 38:5
 90:13
file 105:13,15,15
 108:21 109:2
filed 44:23 45:13
 105:14,17 109:5
 109:13
finance 20:6
financially 21:12
 22:8 117:14
 118:10
find 30:19 85:9
findings 67:12
finish 8:19 81:6
fire 1:8 2:10
 3:20 5:10 7:17
 18:21 19:2 22:5
 25:13 26:18,22
 26:24 27:4,5,19
 32:6,10 33:10,25
 34:8,16,18 37:21
 39:5,18,22 44:4
 44:7,11,25 46:7
 47:25 48:23

49:24 50:9,13,22
50:23 51:3,5
52:13 53:9
54:18,25 55:6,17
55:24 56:5,9,13
57:12,15,18 58:5
58:11 66:8,8,12
66:23,25 67:11
67:13,14,24
68:23 69:3,9,17
70:9,19 71:13
72:22 78:3,10
79:21,23 80:8,10
80:13,18,21,25
81:20,21 82:14
82:16 83:4,12,21
83:24,25 84:9,14
85:8,20 87:17,21
99:18 102:24
103:4,11 110:13
110:20 111:16
111:19,22 112:3
112:9,11,20,21
119:2
**firm** 6:11
**first** 7:4 8:20
9:13 21:21
32:23 33:2
40:16 41:3,11,19
45:22 56:10
65:22 67:2
82:15 103:10
105:6
**five** 61:18 65:25
115:14
**fix** 27:4,5 28:20
29:15,17,20

**fixing** 29:5
**fl** 1:18
**flight** 4:11 77:4
77:11,12
**floor** 2:14 32:18
32:20,23 33:2,5
40:16 41:3,11,19
42:2
**flooring** 28:14
**floors** 32:14,18
**florida** 5:12
30:16 38:3
48:18 59:13
76:13 84:3,10
87:16 90:3,10,20
**flower** 4:5,7
12:17 18:22
19:7 31:21
37:16 40:5 46:2
46:13 58:19
64:10 66:9 75:9
96:23 107:8
**fly** 76:20
**flying** 76:22
**focus** 35:12
**folded** 74:12
**following** 49:23
79:13 102:2
**follows** 7:7 19:15
**foregoing** 117:3
117:4 118:4
**form** 20:23
21:18,23 22:14
24:17 47:4
54:10,11 63:6
69:6 71:14,22
80:4 82:24
83:14 84:15

85:11 89:12
93:17 106:12
107:22 110:15
115:5
**format** 8:16
**forms** 109:4
**fort** 1:18 5:11
10:10
**found** 50:16 81:8
**foundation**
19:14
**four** 65:25
106:11
**frattali** 48:18
49:10,12
**friends** 85:21,22
**full** 8:21 25:14
47:10
**funds** 26:11
36:14
**furnished** 40:18
**furnishings**
43:22
**furniture** 41:24
42:7 56:6,12,15
56:19,25 57:10
57:21,22 58:3,3
**further** 50:20
115:23 117:12
118:8

| g |
|---|
**gain** 108:6,12
**gains** 106:11
**garage** 75:10
**general** 28:23
**generally** 44:25

**generated** 40:11
**gentlemen** 69:11
**getting** 41:15
81:16 92:20
107:12,15
**ginny** 48:17
49:10,11
**give** 8:20,22
57:10,13 69:20
70:14 103:7
104:4 108:25
112:8,15,19
114:2 115:14
**given** 34:22
75:22 78:17
89:17
**giving** 22:24
51:25 93:4
**go** 10:5 23:23
27:6 45:21
48:25 69:22
81:5 84:21,25
92:23 101:12
114:13 115:15
**goes** 27:8 35:11
**going** 7:21 8:4
8:10,18 13:14
19:12 32:17
44:14 45:20
51:9 62:6,11
67:7 76:4,6,21
77:7 78:9 82:9
84:25 86:5,25
90:11 92:25
95:21 101:12,14
101:23,24 102:4
102:4,5,17 110:5
112:24 113:2,7

114:8,11,13
**good** 5:2 7:10,13
  7:14 48:19
  74:22 75:4
  85:22 103:20
**grantee** 63:12
**grantors** 63:11
**great** 16:22
**green** 75:9
**guess** 9:3 24:13
  57:8
**guys** 95:18

**h**

**h** 3:5,15
**half** 20:13
**hand** 6:22 106:5
  107:23 108:3
**hands** 38:7
**happened** 79:8
  110:14,16
**happens** 75:6
  78:9
**happy** 7:24
  74:15
**hard** 38:3
**harvey** 33:6,12
  55:21
**harvey's** 59:24
**head** 8:12
**heard** 81:19
  82:15 115:11
**hearing** 6:20
**held** 91:6
**help** 22:2 24:4
  30:19 74:23
  82:7

**hereto** 45:24
  50:10 117:13
  118:10
**hired** 27:6
**hmm** 99:12
**holder** 53:13
**holidays** 95:15
**home** 11:6 29:9
  30:21,24 31:12
  32:4 39:17
  77:24
**homeowners**
  45:25 46:11
**hookups** 59:24
  60:4
**hope** 74:21
**hospital** 111:13
**house** 10:13
  11:13 12:13,15
  12:16 13:8
  24:25 27:3,7,11
  27:23 28:2 36:2
  37:13 64:23
  71:13 74:23
  75:10 78:3
  81:21 84:9,14
  85:7 100:4
  115:4
**hsa** 106:10
**human** 50:6
**hurt** 81:16
**hyped** 95:17
**hypothetically**
  23:18

**i**

**identification**
  45:6 62:20 66:5

73:8 88:10
  96:16 97:19
  99:11 104:22
  105:10
**identify** 6:7
  104:9,16
**ignition** 50:2,5,7
  67:16
**image** 99:5
**important** 8:5
  8:16
**inaccuracies**
  45:18
**inadvertently**
  50:3
**include** 39:22
  40:4,10
**included** 51:16
  56:5 73:25
  108:17
**income** 3:12
  39:23,24 40:6,6
  40:11,11 55:9
  105:21 106:9
  107:9,16,18
  108:5,18
**incurred** 20:21
**indenture** 62:15
**independent**
  96:12
**indicate** 108:16
  110:13
**indicated** 42:10
  57:6 110:7
  112:14
**indicates** 45:23
  47:12 51:21
  78:17 108:9

**individually**
  36:8
**information**
  16:11 52:12
  53:7,23 69:2
  112:16
**inquest** 54:3
**inside** 27:22 71:7
**insisted** 76:12,14
**installed** 41:10
  43:2
**insurance** 32:7
  35:10 46:12,17
  51:11 53:19
  54:15 65:11
  74:25 78:18
**intend** 24:24
**intended** 5:23
**intending** 77:20
**intention** 29:4
  31:10,13,14
  77:25 78:4
**intentions** 21:5
**interest** 16:3,13
  25:23 63:4
  64:14 65:3,4
**interested** 9:3
  117:14 118:11
**interrogatories**
  13:19
**interview** 51:17
  51:22 52:2,5
  113:20
**intoxicated**
  71:16,20 72:19
  72:23 94:9,13
**investigating**
  112:10

**investigation**
3:20 51:14
67:13 92:16
93:11,15

**investment** 21:4
21:8

**involvement**
112:5

**issued** 25:22
26:6 49:24
50:23 53:12

**issues** 74:22

**it'd** 90:13

**itemization** 13:9
61:7

**itemized** 4:8
11:13 12:20,22

**items** 44:10
58:10,14,15 59:9
60:22

**j**

**january** 18:5
52:22,23 72:15
72:18 89:21
113:20

**jason** 89:15

**jefferson** 1:2

**jennifer** 1:19 5:3
117:2,17

**job** 1:20

**joe** 4:13 71:8,9
71:12 73:20
74:6,20 78:5
84:2,6,9 96:4
112:22

**joe's** 71:7

**joey** 112:5,19

**joint** 45:25 46:6

**joke** 84:4,14
85:4

**joking** 84:8 85:6

**judge** 3:10 98:10
98:11,17 99:8,17
99:22 102:9

**julio** 13:15 28:10
31:8 51:17,22
69:9

**july** 1:14 5:10

**jumping** 46:9
106:4 107:21

**june** 88:20

**k**

**k** 3:15

**keegan** 10:19
87:6

**keep** 23:22,24

**kellogg** 68:8

**kids** 38:5

**kill** 84:24,24
85:2

**kind** 8:13 104:18

**knew** 24:21
101:17 109:16
109:23 111:6

**knock** 95:16

**know** 7:23 8:18
9:5,7 14:13,16
15:7,25 18:12
19:10,14 20:4,7
20:8 29:21
30:11,13,25
32:17 38:24
40:9,13 41:5,13

41:13 42:12
44:4,5,7,8,9,12
50:17 52:16
54:7,11,18 60:14
60:16,16,17,18
61:2,18 62:22
63:14 64:5,13,17
65:10 66:23,25
68:14 69:5,7,8
69:14 70:22,23
71:2,16,18 77:3
77:16 79:11
80:13,24 81:3
82:3 85:12,21
86:3,10,13,19
88:24 89:9 90:2
91:12,16 93:15
95:14,19 98:12
98:14,16 105:25
106:3 107:7
108:23 109:8,16
109:25 110:3
111:24 114:21

**knowledge** 68:19
90:25 91:18,21
117:9 118:6

**knows** 30:18

**l**

**l** 3:15

**labeled** 67:9

**landfill** 97:15

**landlord** 41:9
47:3

**landlords** 46:24

**larkin** 33:6,12
55:21 59:24

**law** 2:5

**lawnmower**
43:25 44:6

**laws** 5:25

**lawyer** 90:23

**lawylor** 33:7

**lea** 18:4 53:3
72:6,17 79:18
92:13,17 93:24
94:6,12 95:13
113:4

**lease** 4:6 33:9,13
33:17,22,24

**leaving** 59:12

**left** 43:6,7 86:6
106:5 107:23
108:3

**legal** 52:10
100:13

**lender** 53:22

**length** 14:11

**letter** 3:19 71:4,5
71:6,11,12,15,19
72:9 73:5,10,14
73:20,25 74:6,11
74:14,20 75:12
75:15,18 78:7,13
78:15,16,22 79:2
79:4,7,13,20
80:3 81:24 82:3
82:21 83:3,10,12
83:19,25 93:20
93:21 94:7,13,16
94:22,24 95:8,10
114:19

**lied** 111:12

**lien** 100:21
101:14

life 35:9
line 47:20
105:21,22 106:8
106:10,23
108:11 119:5
lines 108:12
list 4:8 12:20,22
39:2,17 57:10,16
58:13,14 60:21
60:24 61:2
106:9
listed 39:6,9,11
39:14 57:19
67:14
listen 16:19
17:23 18:7
listened 93:23
listening 100:11
listing 3:22
listings 11:12
12:13 13:8
37:13,16
lists 61:6
litigation 7:18
56:24 58:7
60:20 61:9
little 44:22 59:8
81:7 106:14
live 10:17 18:11
21:4,7 30:16
58:18,24 59:3,6
84:7,10 90:9
lived 10:21,25
42:23,25 57:23
60:10 84:2,3
living 18:17 38:2
43:15,17 58:21

llc 62:18 63:12
63:20 65:8
119:1
llp 2:13
loan 24:15
loarca 51:18,22
52:2 69:9 72:21
located 19:7
44:3,7
location 1:16
55:4
locked 93:2
long 10:21 14:4
14:9,14 18:10
29:22 79:8
101:9 102:8
longer 18:13
64:6 91:16
look 22:18 29:21
44:13 51:7
58:16 67:6
69:25 70:16
75:4 86:3 88:17
105:5,19 107:25
108:11 111:20
looking 11:14
12:23 22:21
41:12 70:3,7
111:14 112:3
looks 45:3 63:10
65:25 66:11,16
66:17 75:7
88:23 96:12
97:12 99:6,8
108:11,13 110:6
111:15,18,18
114:14

loop 1:17 5:11
9:24 10:6,21
lose 95:21
loss 19:2 31:3,7
31:16,22 52:13
53:8,21 55:8
107:8 108:6,13
108:18 109:9
112:11
losses 106:11
lost 56:3,13
lot 19:10 30:18
82:4,5 95:22
love 75:10

m

m 3:15 4:1
mad 84:22
mail 3:10 91:23
99:15
mails 58:17
69:23 70:4,7,17
77:8
maintain 38:3
making 56:23
58:6
management
47:15,19,24
48:12
manager 35:18
48:4,7,16 49:2
manner 6:2
mark 104:5
marked 44:16
45:6 62:8,20
65:18 66:5 73:3
73:8 88:5,10
96:7,15 97:10,18

98:22 99:10
104:8,21 105:2,9
market 53:20,24
54:7
married 38:4
marshal 51:4
69:3,17 70:9,19
marshal's 51:3
masonry 97:12
materials 97:15
matter 5:8 15:5
mccarthy 2:4
6:13,15 14:6,8
14:12,15,19,23
15:19 16:10,22
17:9 20:23
21:18,23 22:14
24:17 31:24
33:20 47:4 54:9
61:11,20 63:6
69:6 71:14,22
80:4 82:24
83:14 84:15,18
85:11,15 89:12
93:17 95:2
103:19 110:15
115:5,18
mean 15:21
21:24 28:8,9
62:9 63:17 76:9
84:16,25 114:23
meaning 33:23
34:22 100:7
102:8
means 6:3 63:15
78:10
medication 9:18

meet  14:2,4,14
    14:21 75:6
    78:11
meeting  16:14
    16:15,20
mentioned  43:20
    80:21 82:4
    109:11
message  98:24
    99:8,16 100:16
    112:4
messages  3:11
    104:20 111:2
met  14:9,11
michael  2:12
    6:11 7:15 10:18
    36:10 68:7
    85:22
michael's  42:22
    42:25
michael.welch
    2:16
million  100:8
mimosas  80:23
mind  69:22
    81:15,19
mine  60:8,9
mint  75:9
minute  69:20
    114:10,12
minutes  61:19
    61:21 103:17,19
    114:14 115:15
mistake  100:7
mm  99:12
moment  112:25
money  20:15,19
    23:3 24:3,20,21

25:7 29:11
    35:23 47:6
    53:14 60:11,12
    101:19 102:5,21
    111:10
month  23:2 34:4
    34:4,12 55:7,10
    55:16,16 100:24
months  34:15
    55:17 100:23
morning  5:2
    7:10,13,14 14:24
    67:3 111:4
mortgage  19:21
    19:25 20:6
    21:17,21,25 22:3
    22:9,13 23:9,12
    23:15,20 24:9,22
    25:14,17 26:6,11
    26:15 32:8
    35:25 36:2,15,20
    46:18,19 53:13
    53:14,22
mother  76:7
    77:23
mother's  87:10
    103:5,12
move  21:5 82:9
moved  48:18
    56:22 87:15,19
moving  57:7
    100:4
mura  11:23,25
    71:24 76:12
    90:17,22 91:2,10
    91:23
mute  112:25

myers  1:18 5:12
    10:10

**n**

n  2:1 3:1 4:1,1
name  5:2 7:15
    33:2,5 37:2 49:9
    64:24 99:5,22
    112:9,19 119:2,3
names  29:23
need  8:11 9:9,12
    17:3 41:14,14
    44:23 74:23
needed  8:7 24:21
    30:19 47:9
negative  105:23
    106:15,19,20,24
    108:14
neither  117:10
    118:6
net  108:12
never  21:24
    109:6
new  1:1 4:11
    5:15 12:18
    18:22 28:9,9,14
    28:14 30:17
    46:2 58:24 59:3
    59:6,12 68:21
    75:24,25 76:5,10
    76:21 77:21
    78:2 87:12,17,25
    90:3,5,8,19
    96:23 103:3,11
    108:10 117:19
    119:1
night  12:11

nine  105:22
    106:23
nods  8:12
northern  35:15
notary  1:19 5:13
    116:20 117:18
    119:25
notation  66:18
    67:10
note  9:24
notes  66:12
    115:15
nothing's  28:21
    28:22 41:15
noting  45:17
november  19:9
    19:15 22:5 24:6
    48:24 75:17,20
    78:23
number  4:13
    85:24 86:8,11
    105:21
numbers  86:15
    107:4
ny  2:5,7,15

**o**

o  3:15 4:1,1
oath  19:12 52:9
    89:24 90:8 91:6
    92:5,11
oaths  5:14
object  15:19
    24:17 54:9,10
    63:6
objection  5:17
    6:20 14:6 16:10

**obligations**
47:16
**observed**  28:5
66:25 67:2
**obtain**  30:6
**obtained**  30:3,10
30:14,25 97:22
113:3
**occasion**  24:9
39:6
**occasions**  39:8
**occupied**  55:5
**october**  46:10
67:10 68:6,13
69:18 70:10
75:16
**office**  18:4 53:4
67:18 70:24
72:6,17 79:18
92:18,24 93:25
94:6,12 113:4
**officer**  117:1,2
**offices**  68:2
**oftentimes**  8:17
**oh**  61:17 76:14
84:23 92:15
106:13
**okay**  6:19 7:8,9
7:9,24 8:2,8,13
8:24 9:2,7,15,22
10:3,9,20,24
11:4,15,18,24
12:3,6,9,12,16
12:20 13:4,7,7
13:17,22 14:4
15:11,14 16:22
17:6,12,17,21,25
18:7,13,16,20,25

19:4,6,10,15,20
19:24 20:4,9,14
20:18 21:9 22:3
22:7,23 23:2,5,8
23:11,14,16,23
24:2,12 25:6,11
25:16 26:4,9,17
26:21 27:10,13
27:16,22,25 28:4
28:15 29:7,12,19
30:6,10,13 31:17
31:24 32:10,14
32:19,25 33:4,8
33:16,20 34:3,22
35:3,12,16,19
36:6,11,14,19,22
37:2,10,15,19
38:11,14,18 39:4
39:8,15,21 40:9
40:21,24 41:2,8
41:17,18,22,24
42:2,6,9,12,17
43:6,10,18 44:2
44:14,20 45:8,11
45:16,20 46:5,9
46:16,21 47:3,12
47:22 48:7 49:7
49:14,22,22
50:17,19 51:2,8
51:21,25 52:4,7
52:20 53:2,11,18
54:4,14,21 55:3
55:3,9,12,15,20
55:23 56:2,18
57:3,14 58:2,10
58:13,18,24 59:9
60:6,14,17 61:5
61:20 62:6

63:14,20,23 64:2
64:5,13 65:2,7
66:7,11,16,22
67:6 68:11,24
69:13 70:16,22
71:5,8 72:4,8,11
72:16,21 73:2,24
74:8,14,19 75:11
75:14,20 76:3,9
76:17,24 77:3,7
77:19,25 78:7,16
78:21 80:7 81:5
81:17 82:9,13,20
83:9 84:13 85:5
86:5,14,18 87:9
87:15,24 88:4,12
88:14,17,25 89:5
89:16 90:6,16
91:4,9,18 93:9
93:14 94:11,15
94:18,23 96:6,18
96:21 97:2,5,9,9
97:24 98:4,9,19
98:21 99:20,25
100:15,19 101:4
101:8,25 102:22
103:3,9,14,21,23
104:7,24,24
105:13,17,19,25
106:4,17,23
107:3,7,17,21,25
109:7,21 110:11
111:14 112:7,13
112:18 113:9,16
113:19,23 114:8
115:8,11,14,18
115:22 116:3,7

**once**  81:22,23
84:4
**open**  75:2
**operated**  46:22
**opposed**  90:9,20
**ordering**  116:4
**original**  67:13
116:4
**outcome**  117:14
118:11
**owe**  23:8 53:13
100:22
**owes**  100:23
**owned**  36:7,9,11
46:22 47:19
48:12
**owner**  35:4
41:10 63:23
64:7 89:11,17
**owner's**  89:6
**owners**  46:6
64:3
**ownership**  63:4
64:14,20

**p**

**p**  2:1,1 3:15
**p.m.**  66:19 99:7
104:3 110:8,14
110:17,21 116:8
116:10
**page**  3:2,6,16 4:2
62:14 65:20,24
65:24,25 66:2
67:7 104:17
105:6 106:4
107:21 108:2
119:5

**paid** 24:23 25:14
26:15 32:8
34:20,23 46:17
49:14 53:15
55:7 86:20
**paragraph** 45:22
46:10,21 49:22
51:9,19 52:7
53:18 54:5 55:3
56:2 58:4 59:15
67:20,24 68:5
70:23
**part** 43:22 68:9
96:11 98:25
108:5 109:17
**particular** 35:14
67:24 68:8
74:14 97:6 99:4
100:15 110:12
**parties** 5:15,19
117:11,13 118:7
118:10
**party** 16:7
**pay** 21:25 22:3
23:19,21 24:21
24:24 25:23
35:25 36:15,20
37:5 47:6 49:11
65:2 74:24 78:2
**paying** 21:17,21
34:9,13,19 55:10
55:17 85:3
**payment** 20:11
20:16 22:9,13
23:15 24:8,12
26:2,5 32:8
53:12

**payments** 25:22
26:6 36:3
**payoff** 53:22
**pelton** 3:19 71:9
73:21 74:6 78:2
78:8,22 79:5
81:20 82:22
83:4,19,21 85:7
85:14,19 86:11
112:5,23 114:20
115:3
**pelton's** 4:13
85:24 86:8
112:19
**people** 30:18
81:16 86:25
111:9
**percent** 20:13
**perfectly** 9:10
**period** 22:10
87:25
**permitted** 5:23
**person** 43:6
47:22 76:12
**personal** 4:8
36:3,6 39:24
49:15 56:4,20
57:9,16 60:21
108:18
**personally** 98:14
**persons** 29:24
**phone** 4:13
13:15 22:22
78:25 79:12,19
85:24 86:4,8,11
86:15 96:5
**photographs**
104:11

**phrase** 18:25
**place** 28:12,20
29:15,20 30:4
33:23,24 114:6
**placed** 59:11
**plaintiff** 6:13
52:9
**plaintiff's** 46:13
**plaintiffs** 1:6 2:2
15:22 45:24
46:11,23,24
51:11,12,15,15
53:20 54:2 55:4
56:3
**plane** 86:20
**planned** 25:2
76:18
**plans** 75:23,25
**play** 113:2,8
114:8,11
**played** 113:11
113:13 114:16
**plaza** 2:14
**please** 6:7,22
7:23 25:12
26:25 33:5 34:7
39:10 61:12,15
74:10 80:14,15
82:25 92:8
103:18 116:6
**pllc** 2:5
**point** 25:21,25
42:25 57:8
**police** 99:2 112:7
112:8,9,20
**policy** 35:10
46:12 53:19
54:15

**poorly** 103:9
**portion** 23:11
82:10 113:2,8,12
114:9,12
**portions** 65:21
**pose** 8:3
**possible** 67:19
68:4 70:25
**postmark** 75:22
78:23
**potential** 93:11
93:16
**preparation**
12:7 13:10
14:22,25 17:19
17:22 37:11
**prepared** 57:16
60:19 118:3
**present** 16:7
17:9 42:13
**preserve** 10:25
18:11,17 24:5
58:22
**pressure** 95:23
**presumably**
102:10
**pretty** 80:14
**previously** 44:16
45:5 62:8,19
65:18 66:4 73:3
73:7 88:5,9
98:22
**primarily** 47:14
47:23
**prior** 10:20,24
11:22 20:11
32:6,10 33:10
34:8,18 37:19,21

39:4,18,21 44:3
44:7 45:12 46:7
47:25 48:22
52:8 57:7 59:12
60:10 70:3
73:18 75:14
76:2 79:20
83:12 84:5 85:5
86:18 100:24
101:16 109:4
111:16,19 117:4
**private** 10:13
**privilege** 14:19
**privileged** 14:8
14:10 15:21,24
16:2,11,15
**procedural** 5:24
**proceed** 16:23
**proceeded** 92:23
**proceeding** 1:16
5:5,22 116:11
118:4
**proceedings**
117:3,4,5,8
118:5
**proceeds** 78:18
**process** 29:8
**produce** 69:24
**produced** 5:21
**producing** 108:5
**production**
31:18 33:17
52:12 53:7 61:6
77:8 96:11
**proof** 52:13 53:8
**properties** 65:8
**property** 4:8
11:4 19:7,8,16

19:22 20:6,12,22
21:3,12,15 25:23
26:12,18 27:16
28:6,25 29:5,13
30:8,17 31:21
32:12,15 35:18
37:23 38:6,12
39:2,5,24 40:11
41:10 43:2,7,15
43:22 46:6,13,22
47:9,15,16,19,23
47:24 48:4,7,12
48:15 49:2
53:21,24 56:4,20
57:17 60:21
63:2,4,19 64:7
64:19 65:3,4,12
67:2 75:7 89:11
89:18 91:14
107:18 108:5,9
108:10,19
109:10
**proposal** 3:8
96:9,14 97:2,22
97:25
**provide** 86:16
**provided** 13:18
18:3 23:3 33:19
42:18 67:18
68:2 70:24
86:17 99:3
104:14 105:3
113:6
**providing**
114:25
**public** 1:19
116:20 117:18
119:25

**pull** 81:9
**purchase** 19:8
19:16
**purchased** 20:2
20:21 21:3,7,16
21:22 76:25
77:5,17
**purchasing**
20:12
**purpose** 76:3,5
92:4 100:2
**pursuant** 113:5
**put** 20:11 28:8
31:23 32:2
35:21 38:15
39:12 41:6
61:10,12 71:7
77:14 86:7
101:14
**putting** 37:23
39:15 57:25

**q**

**qualified** 117:7
**question** 7:23
8:3,6,18,21 9:5,6
9:12,13 15:6
16:19,24 17:4
21:19 28:15,16
29:3 40:3 57:5
64:18 69:13,14
69:19 70:2
84:19 93:5 95:2
103:10 109:14
109:23 114:24
**questions** 7:22
8:11 13:12,14,16
15:15 17:14

19:13 44:18
50:21 82:11
113:9 114:18
115:23
**quick** 115:17
**quickly** 104:18
**quote** 53:8
**quotes** 29:11,12
29:14

**r**

**r** 2:1 3:15,15 4:1
4:1
**rachel** 118:2,14
**radler** 2:13 7:16
**raise** 6:22
**rayburn** 33:3,9
34:4,9 40:18
55:13 99:17
104:13
**rayburn's** 112:9
**rc0001** 3:17 45:5
62:8,10
**rc0002** 3:18
62:11,19
**rc0003** 3:19 73:5
73:7
**rc0004** 3:20
65:19,23 66:4
**rc0005** 3:22 88:6
88:9
**reach** 26:9
**reached** 54:18
69:16 70:9
107:10
**reaching** 115:3
**read** 11:18,21
12:6,10 45:12,17

51:9 102:3
**reading** 22:19
**reads** 52:8 53:18
  56:2 67:11
  70:24
**real** 106:18
**really** 41:11
  77:10 85:22
  98:15
**realty** 62:17
  63:12,20 64:10
  64:15,21 65:7,11
**reason** 77:20
  88:25 90:6
  112:18 119:5
**rebuilt** 31:4
**recall** 20:9,12,14
  20:17,18,25 21:2
  22:8,24 23:2
  29:23 34:13,14
  34:15,17 38:22
  38:24 39:19
  45:11,16,19
  51:25 52:4,21
  54:21 58:3
  66:22 75:20
  76:24 77:2,18
  79:16,22,25 80:6
  80:7,17,20 81:3
  83:19,20,24 88:2
  93:22 94:5,8,15
  95:12 99:15
  105:14 112:6
  113:19 114:17
  114:25
**recalled** 96:3
**receive** 39:23
  40:5

**received** 11:23
  25:16 29:20,24
  31:19 66:19
  96:9 97:3 98:6
  98:25
**recognize** 62:13
  65:22 66:3
  88:12 113:14
**recollection** 70:3
  75:18 95:3,5
**recollects** 95:7
**record** 5:4,5,18
  6:8 9:14,23
  61:24 62:2,4
  103:24,25 104:3
  104:16 115:18
  115:19,20 116:8
  117:9 118:5
**recorded** 6:2
  17:23 52:5
  72:22 113:3,24
  114:3 117:6
**recording** 5:21
  18:2,8 113:5,13
  113:14,17 114:5
  114:9,11 115:12
  117:8 118:3
**recovered** 56:9
**reduced** 117:6
**refer** 70:8 107:5
**referenced** 52:17
  102:19
**references** 59:15
**referred** 50:14
  58:4
**referring** 12:14
  12:17 13:20
  44:3 50:20

59:10 72:5 73:6
  114:22
**refers** 71:2 106:2
**reflect** 67:12
**refrigerator**
  40:24,25 41:20
  42:5,10
**regard** 25:8 30:7
  31:20 66:8
  77:11 78:25
  79:6,13 91:5
  93:15 114:19
  115:3
**regarding** 4:4,10
  51:18
**regards** 92:13
**regional** 97:15
**regret** 82:6
**reimbursing**
  25:2
**related** 117:10
  118:7
**relative** 27:14
  117:12 118:9
**relevant** 45:23
  47:13
**remarks** 67:9
**remember** 24:19
  31:8 35:21
  38:20 39:20
  42:20 45:14
  54:17 56:21
  57:22 58:20
  70:13 72:25
  74:2 75:19 79:9
  79:15,22 82:2,5
  83:6,9,11 87:7
  87:13,14 88:3

91:22 94:17,18
  94:21 103:6
  107:20
**remembered**
  94:22,24
**remembering**
  83:7
**remote** 1:16 8:17
**remotely** 5:16
**removed** 43:10
**renewed** 46:11
**rent** 24:4 34:9,13
  34:19 37:6
  39:12,14 40:5
  55:17 57:24
  60:11,12 85:3
  100:10
**rental** 39:23
  43:23 55:9
  106:18 107:15
  108:9
**rented** 32:12
  40:17,18 41:18
  41:19 42:3
**rents** 49:18
**renzi** 3:10 98:10
  99:9,17,22 102:9
**repair** 4:4 26:12
  26:24 27:18
  28:7,24 29:13
  31:12,20
**repairing** 29:8
**repayment** 25:8
**repeat** 19:12
  25:24 57:7 92:8
**rephrase** 7:24
  8:7 17:3 63:9
  82:25

**report** 3:21
49:25 50:4,7,9
50:14,24 51:4,6
66:8,12 67:11,14
67:24 68:23
69:4,18 70:11
84:12 110:20
**reported** 1:19
**reporter** 5:2,3
6:19 7:8 61:24
62:3 103:23
104:2 115:20
116:3,7
**reporting** 119:1
**represent** 7:17
44:20 92:10
96:8 98:23
105:2
**represented**
89:23
**request** 26:10
27:9 31:23
61:10 77:14
90:17 92:6
**requested** 28:11
79:2
**requesting** 79:6
**required** 51:10
**reside** 10:15
**respect** 9:4
21:11 47:17
**respectively** 55:8
**responding** 92:5
**response** 8:11
13:19 93:5
98:25
**responses** 105:5
107:12

**responsible**
21:11,16,20
47:15,23 82:17
**responsive** 82:11
**rest** 24:2
**restroom** 61:19
**result** 44:11
57:18 58:5,11
**resulting** 55:8
**retain** 29:10
52:20 93:6,10
**retained** 27:2
28:22 29:7 32:3
52:10 89:21
90:23 92:3,9,12
97:6
**return** 3:12
105:8
**returns** 105:3
108:19
**review** 11:9,11
13:17,23 109:4
**reviewed** 12:13
13:10 17:17
37:12 54:15,22
**revised** 68:12
**rich** 24:20
**richard** 1:4 2:2
5:8 7:20 15:4,7
15:25 16:6 17:7
17:13 19:19,24
21:15 22:7,24
25:2 35:5,7,19
36:12,16 37:8,21
40:10 44:17
45:24 47:3 49:6
62:17 63:3,11,18
63:23 64:6,13

65:2,19 73:4,11
73:19 89:9
**richard's** 16:8
21:5 37:2 56:13
**rid** 48:19
**right** 6:22 8:10
8:15 9:9,17
10:12 16:25
48:25 60:19
64:9 65:16 68:6
85:2,25,25 88:7
88:14 89:10
110:4 111:23
116:2
**ripped** 28:12
**rivkin** 2:13 7:16
**rivkin.com** 2:16
**rmccarthy** 2:8
**roberts** 118:2,14
**rogers** 10:18,19
36:10
**room** 95:16
**roughly** 114:15
**roy** 11:24
**royalties** 106:19
**ruled** 67:17
**rules** 5:25
**rxr** 2:14
**ryan** 2:4 6:14
7:10 16:14

**s**

**s** 2:1 3:5,15,15
4:1 5:1 6:1 7:1
8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1

20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
119:5
**sale** 12:15 37:16
37:23 38:16

39:2,6,9,17

salvageable 31:5

sarasota 91:15
91:16

sat 15:8

satisfaction
25:17

satisfied 26:7

satisfy 26:11

save 27:8 31:16

savings 36:23

saw 111:2

saying 101:12
102:11,15

says 46:10 49:22
50:9 51:10 55:3
59:17 62:15
68:7 75:8 78:14
96:22 97:13
100:22 101:8,20
105:21 106:6,8
106:10,11,12,15
106:24 107:22
108:4 110:7

sc0001 3:7 96:7
96:15

sc0002 3:9 97:10
97:18

sc0003 3:10
98:22 99:10
110:6

sc0004 3:11
104:8,16,21

sc0005 3:12
105:2,9

scare 100:12
111:6,12

scared 95:19,23

scenarios 67:19
68:4 71:2

schedule 105:22
106:6

schwarts 90:2

schwartz 52:19
52:21 53:6
89:21 92:3,9,12
93:6,10

scope 96:21

screen 44:18

scribble 88:23

scroll 45:2
104:18

second 32:20
33:5 42:2 62:14
89:6 104:4
114:11

seconds 114:14

section 66:17
67:8,9 108:4

secure 28:11

see 13:12 44:18
45:3 46:3,14,24
46:25 50:10
51:18 52:14
54:4 58:17
62:18 63:12
66:13,20 67:20
75:10 78:5 88:8
88:18 89:7
92:15 96:14,19
96:24 97:17
99:9 105:23
106:6,15,20,24
107:23 108:7,14
109:12 110:9

111:20 112:24
115:16

seeing 110:11

seeking 82:7

seen 45:3,8 51:2
67:22,23 68:8,15
68:17

sell 38:5,12
39:13 88:7,15
89:10

selling 95:18

send 70:15 77:4
99:23 112:4

sending 83:6,8
83:10,19,24
94:16,22,24
99:15,21

sent 60:24 73:20
73:22 74:6
75:15,18,19,21
78:8,22 79:4,12
79:20 80:3
81:24 82:22
83:3,11 95:8,9
95:12 110:12
111:16,19
114:20

sentence 56:10

separate 16:6

series 7:21

services 49:12

set 71:13 81:20
83:4

setting 78:3
83:25 84:9,14
85:7 112:3

seven 65:25

share 37:6

sheet 119:1

sheriff's 13:16
18:4 53:4 72:6
72:17 79:18
92:13,17 93:20
93:25 94:6,12
95:13 113:4

sheriffs 71:25
72:5 84:12

shock 81:7,11,15

shocked 93:21

shoulder 8:12

show 44:15 51:7
62:12 65:17,21
65:24 67:7 96:7
100:21 101:15
104:8 105:20

showed 71:24
72:8 93:19,21
94:7 95:11
110:19

showing 73:2
88:4 97:10
98:21 100:12
104:25 110:5

shown 65:23

shows 78:20
99:5 101:12

shrugs 8:12

side 107:23
108:3

sided 101:4

sign 38:25 39:16
89:2,10,14,16

signatory 35:19

signature 75:12
88:19,22 89:6

117:16 118:13
signed  38:23
    88:24
signing  92:21
similar  13:5
similarly  112:4
simply  9:6
single  11:6
sir  72:7
sit  69:2,14 109:7
sitting  64:24
six  65:25
sj  62:17 63:11,20
    64:9,15,20 65:7
    65:10
skills  117:9
    118:6
skimmed  54:23
smith  89:15
snowblower
    43:24 44:2 56:8
    57:20
sold  24:25
sole  35:3
solicitation
    93:16
somebody  27:6
    27:10 30:19
    49:2 84:23
    100:13
son  10:18 87:3,7
    95:21
soon  75:11
sooner  90:14
sorry  40:2 84:8
    103:9 108:2
sought  61:9

sounds  68:24
source  67:16
space  86:6,16
    89:5
speak  15:11
    83:23
speaking  8:23
    83:20
specific  60:21
specifically
    94:11
specify  26:25
    57:3
speculate  9:4
speculating
    68:25
split  38:6
spoke  69:10
    79:12 80:17,24
    94:5,25 95:4
spoken  96:4
spreadsheet  13:5
stable  28:10
start  111:21
started  38:4 48:5
    66:23
starting  6:8
starts  68:5 114:9
state  1:1,8 2:10
    5:9 6:10 7:17,20
    9:6 11:14 12:24
    13:18 25:21,25
    27:9 40:6 44:24
    53:12,15 54:16
    54:19 68:21,21
    69:3,16 70:8,19
    107:13 117:19
    119:2

stated  50:8
    91:23 110:20
statement  6:18
    53:3 70:5 72:12
    72:15,18,22,24
    78:12 93:4,24
    102:3 115:2,9
states  62:14
    74:20 100:19
stating  102:3
stay  91:15
stenographic  6:3
stephanie  1:4,13
    2:2 5:7,9 6:14
    6:17 7:3 16:2
    45:25 47:14
    52:10 62:16
    75:11 99:5
    110:7 116:14
    119:3,21
stephen  19:19
stick  40:16 41:8
    48:24 58:2
stipulation  6:5
    6:12,16
stopped  34:9,13
    55:16
stored  57:8
stove  40:24,25
    41:20 42:4,10
street  2:6
strike  82:10
structure  97:14
stuff  56:16,18
    60:25
submitted  13:2
    68:20

subpoena  98:25
    113:5
subscribed
    116:16 119:22
substance  71:19
substantial  56:4
substantiate
    70:17
sudden  68:22
sued  101:19
suggests  78:8,13
suite  2:6
supplemental
    51:3
support  43:17
    70:5
supposed  76:19
    76:20 100:14
    111:3
supreme  1:1
sure  15:7 21:20
    25:25 27:2,20
    40:4 57:6 61:14
    61:23 63:9
    69:21 79:24
    80:14 81:12,17
    83:2 86:2 92:9
    96:10 114:25
surprise  74:5
    76:7 77:22
swear  5:15 6:20
sworn  5:18 7:5
    116:16 117:5
    119:22
syracuse  2:7

| t |
|---|

**t** 3:5,15 4:1,1
**table** 58:8 59:10
**tables** 58:9 59:11
**take** 5:4,13 9:10
9:14 49:4,17
61:18 77:13
100:9,20 103:17
108:11 111:9
**taken** 5:8 9:18
19:21 28:13
77:12 101:13
109:9 111:7
114:5 117:3,11
118:8
**talk** 47:10 78:5
90:22
**talked** 79:9,23
100:13 102:18
**tasks** 52:11
**tax** 3:12 105:3,8
108:19
**taxes** 32:7 39:25
40:7,12 100:20
101:14 107:9
109:2,9
**team** 67:13
**tear** 29:18 30:4
**tell** 7:5 73:16,24
80:14,15 92:24
95:25 104:19
**telling** 79:22,25
93:22 95:7,20
**ten** 46:10 61:18
61:21 103:17,19
**tenant** 32:19,22
32:25 33:4 34:4
48:22,24 55:10

55:16 60:9
82:18 85:3
101:17
**tenants** 4:6
32:12 33:18
34:19 37:5
42:19,22,24
43:11 47:11,25
48:20 55:6,7
81:16 82:17
101:16 111:7
**term** 33:23
**terms** 28:7 53:19
**testified** 7:7
12:21 37:11
46:17 85:15
102:24
**testify** 9:20
**testifying** 117:5
**testimony** 9:19
19:11 56:11
59:19 74:9
76:15,16 82:10
**text** 3:11 98:19
98:24 99:8,16
100:15 101:11
104:11,12,20
110:12,25
111:15,20 112:4
**texts** 100:25,25
**thank** 6:19 7:9
10:9 86:18
103:22 115:24
116:2
**thanks** 61:22
103:20
**theft** 108:6

**thing** 8:13 42:9
101:18
**things** 12:23
41:9 43:13 56:6
82:5,6
**think** 14:15 60:9
61:11 68:17
69:20 87:13
94:23 96:11
102:23
**thinking** 112:22
**thought** 81:18
82:18,20
**threatened**
92:19
**threatening**
95:22
**three** 20:13
65:24 67:8
100:23
**thrown** 50:3
**ticket** 76:23,23
76:25 77:17
87:5 90:12
**tickets** 86:20
**time** 1:15 6:6
9:10 10:24 12:9
14:11 19:20
22:4,10 23:9
25:8 28:6 29:22
33:24 36:9
38:12 53:21
55:6 59:8 66:17
66:23,25 70:20
72:11,13,14,19
74:23 75:23
78:11 81:10,11
87:11 88:2 95:3

96:3 99:6
103:10 110:6,11
111:15 113:23
115:23,24
**times** 45:23
47:13 79:9
87:24 100:8
**today** 7:22 9:3
9:18 11:8,22
12:7 15:9 17:19
17:22 31:22
37:12 56:11
57:15 69:2,15
86:12 109:8
115:25
**told** 15:24 21:24
25:3 31:4,6,15
49:21 73:19,22
79:17 94:8,11,19
94:21 95:9,10
96:2 100:3,8
111:12
**top** 62:13 66:14
100:19 102:2
**total** 31:3,6,16
**tower** 2:14
**town** 30:21,24
**townhouse**
10:14
**traci** 33:3,9 34:3
40:17 55:12
60:10 82:19,20
99:17 100:3
104:13,13,20
110:12,25 112:9
**traci's** 60:2
**transcriber**
118:1

| | u | v | |
|---|---|---|---|
| **transcript** 5:20 11:16,21 12:10 13:8 17:18 86:7 86:17 116:4 118:3,4 | **u** 3:15 4:1 **understand** 5:19 7:22 8:6 15:6 20:24 29:2 41:12 47:5 80:5 89:13 112:2 115:6,7 | **v** 1:7 3:15 119:2 **valuations** 4:9 61:8 **value** 53:21,24 54:2,8 107:17 109:10 | 112:15 **warranty** 62:14 **wash** 38:7 **washer** 41:2 42:13,17,20 43:2 43:7,18 57:20,25 59:23,25 60:3,4 60:13,15 |
| **transcriptionist** 117:7 **transfer** 23:6,7 63:3 64:14,19,22 65:4 | **understanding** 18:20 19:3 21:14 25:12 34:6 56:12 59:20 74:9 75:15 97:5,24 102:23 107:4 | **values** 60:23 61:3 **various** 113:7 **verbal** 8:11 **verbatim** 54:23 **veritext** 5:4 119:1 | **washers** 56:7 59:18,21 **water** 23:24 **watertown** 12:18 18:22 21:6 46:2 49:24 96:23 98:11 99:2 108:10 |
| **transferred** 35:24 62:25 63:18 **trash** 50:3 **traveled** 76:10 **trick** 28:16 **tricky** 28:18 **trip** 76:5,17 86:24 87:8,9 103:11 | **understood** 8:5 **unfortunate** 101:21 **unfurnished** 42:3,4 **unintentional** 50:5 67:15 **union** 35:15 **uniondale** 2:15 **unit** 41:19 42:15 | **version** 45:8 **videoconference** 1:12 2:4,12 **visit** 87:18 **voice** 113:14,16 115:10 **vs** 5:9 | **way** 10:25 18:11 18:17 24:5 56:22 58:22 69:4 100:6 102:21 111:5 **we've** 59:17 102:18 |
| **true** 117:8 118:4 **truth** 7:5,6,6 95:25 96:2 **try** 19:12 27:7 **trying** 104:5 111:5,11 **tuesday** 1:14 75:3 | **unlocked** 74:25 **unquote** 53:8 **upper** 106:5 107:23 108:3 **upset** 85:2 **use** 38:19 55:9 61:19 101:21 | **w** <br> **wages** 111:9,10 **wait** 87:6 101:9 **waited** 102:8 **walls** 28:12 **want** 14:13 25:3 50:17 61:18 64:19,23 69:25 70:8 84:24 103:16 104:9,15 109:14,16 | **wednesday** 75:4 **week** 68:20,22 **weekend** 100:4,5 **weeks** 14:24 **welch** 2:12 3:3 6:10,11 7:9,12 7:15 14:7,9,13 14:17,20 16:4,14 16:25 17:2 31:25 33:21 |
| **twisted** 41:14,15 **two** 14:24 15:22 21:10 32:18 38:8 55:4 65:24 79:19 95:18 98:4 100:24 101:4 **type** 11:4 106:9 **typewriting** 117:6 | **uses** 5:23 **utilities** 23:21 24:13,22 75:3 **utilized** 55:4 | **wanted** 25:3 26:15 64:16,17 64:22 76:11 81:17 90:7 91:15 100:11 | 61:5,14,17,23 62:5 69:12 72:3 77:7,15 82:9,12 83:15 84:17,20 85:18 86:5,9 |

95:6,24 103:16
103:21 104:4,6
115:14,22 116:3
116:6
**went** 27:10 50:4
69:9 71:23
103:6 110:25
**west** 2:6,14
**westfall** 2:5
**westfalllaw.com**
2:8
**wife** 42:22,25
57:23
**willing** 39:13
**win** 100:20
**windows** 28:9,14
**withdraw** 64:18
66:24 85:13
**withdrawn**
12:21 15:3
20:10 29:14
37:20 49:8
67:23 70:6
76:19 80:9
82:15 83:20
84:7 86:19
99:21 112:8
**witness** 5:16,18
5:19 6:21 7:4
61:15,21 69:7
71:23 95:9
103:15,18,22
116:2 117:4
**witnesses'** 119:3
**woman's** 49:9
**wondering**
68:15

**word** 101:21
**worded** 80:13
103:9
**words** 74:15
**work** 21:6 27:3
27:18 48:10,17
92:18 96:21
97:7
**worked** 48:8
**worry** 102:20
**wow** 101:9 102:7
**write** 107:14,17
108:23
**writing** 31:23
61:10,12 77:14
82:3 94:9
**written** 6:4 33:9
33:13 58:14
71:6,17
**wrong** 25:13
31:11 34:8
74:10
**wrote** 71:12,15
71:20 73:13
94:13 102:7

| **x** |
| --- |

**x** 3:1,5,15

| **y** |
| --- |

**y** 3:15
**yeah** 14:8 16:23
26:3 30:16
53:16 54:10
60:12 61:17,21
63:16 74:7 82:2
84:11 93:19
94:20 95:11
101:11 102:17

103:18,19
105:24 110:24
111:24
**year** 12:4 18:14
**years** 56:22
64:24 93:2
**yep** 61:14 99:24
**york** 1:1 4:11
5:15 12:18
18:23 30:17
46:3 58:24 59:3
59:6,13 68:21
75:24 76:2,5,10
76:21 77:21
78:2 87:12,17,25
90:3,5,9,19
96:23 103:4,11
108:10 117:19
119:1

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to
the witness for examination and shall be read to or
by him or her, and any changes in form or substance
which the witness desires to make shall be entered
at the end of the deposition with a statement of
the reasons given by the witness for making them.
The deposition shall then be signed by the witness
before any officer authorized to administer an
oath. If the witness fails to sign and return the
deposition within sixty days, it may be used as
fully as though signed. No changes to the
transcript may be made by the witness more than
sixty days after submission to the witness for
examination.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.